# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-1707

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Mario Morreno, | * |
| | * |
| Appellant. | * |

_____

No. 03-1953

_____

Appeals from the United States
District Court for the
District of Nebraska.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Francisco Beltran-Hernandez, | * |
| also known as El Gordo, | * |
| | * |
| Appellant. | * |

_____

Submitted: February 12, 2004
Filed: June 28, 2004

_____

Before BYE, HEANEY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Mario Morreno and Francisco Beltran-Hernandez contend that the district court[1] erred in denying their motions to suppress. Beltran-Hernandez also argues that there was insufficient evidence to support the jury's verdict and that the court erred in denying him "safety valve" relief. We affirm.

I.

On October 12, 2001, Omaha Police Officers Mark Lang, Daniel Clark, Brian Heath, Mark Desler, and other officers in the Drug Interdiction Unit executed a search warrant at 3130 Chicago Street, Apartment No. 4, in Omaha, Nebraska, in search of illegal drugs. During the search, Officer Clark escorted Marie Smith,[2] one of the occupants of Apartment No. 4, into the hallway. While in the hallway, Smith told Officer Clark that some of the methamphetamine found in the apartment belonged to the occupants of Apartment No. 7. Smith stated that "El Gordo," the owner of Apartment No. 7, sometimes stored his drugs inside Apartment No. 4. This was the first information the officers had received about Apartment No. 7.[3]

According to Officer Clark, during this conversation, he heard footsteps proceeding up the apartment's stairwell towards them. Officer Clark concealed

_____

[1] The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

[2] Fifteen-year-old Marie Smith testified that on October 12, 2001, she lived at 3130 Chicago Street, Apartment No. 4, with her boyfriend and her sister, Amanda Smith.

[3] Apartment No. 7 is located across from Apartment No. 4 on the same floor of the apartment building.

-2-

himself in the upper stairwell. Officer Clark observed a man–later identified as Morreno–approach Apartment No. 7. Officer Clark greeted Morreno in English. Officer Clark asked Morreno, "How are you doing?" Morreno turned around, saw Officer Clark, and responded in English that he was "okay." In response to Officer Clark's questions, Morreno, in English, provided his name and stated that he had come to the apartment building to visit his cousin who resided in Apartment No.7. Morreno appeared to understand Clark's questions and maintained eye contact during the questioning. During the conversation, Morreno reached (approximately three times) with his right hand to his right-front pants' pocket.

During this initial encounter, Officer Lang entered the hallway. Officer Lang observed Morreno standing next to Apartment No. 7. Morreno held a set of keys in his hand and was carrying a backpack. Officer Clark advised Officer Lang of the situation. Officer Lang inquired whether Morreno lived in Apartment No. 7, and Morreno responded that he was there to visit a friend. The officers told Morreno that they were conducting an investigation possibly involving Apartment No.7 and that they were trying to determine if he resided in that apartment. Officer Lang also observed Morreno reach into his right-front pants' pocket. Officer Clark advised Morreno to keep his hand out of his pants' pocket.

Because of Morreno's attempts to reach into his pocket, Officer Lang conducted a pat-down search for officer safety. Officer Lang asked Morreno if he could take his backpack and place it on the floor while he conducted the pat-down, and Morreno responded by sliding the backpack off of his shoulder.

Officer Clark requested permission to search Morreno's backpack. Morreno consented. Officer Clark did not immediately open the backpack, but instead asked Officer Heath, who was fluent in Spanish, to ask Morreno for permission to search in Spanish. Officer Heath explained (in Spanish) to Morreno that the officers were conducting a narcotics investigation and, as part of that investigation, the officers

would like to search Morreno's person and backpack. Officer Lang testified that he heard Moreno respond, "*Si*" to Officer Heath's request to search.

Officer Clark searched the backpack after Officer Heath told him that Morreno had consented. Officer Clark found packages of methamphetamine wrapped in a yellow-colored cellophane. Morreno uttered an expletive, but made no other statements. Officer Clark removed the methamphetamine from the backpack and told Officer Lang to arrest and handcuff Morreno. Clark continued to search through the backpack and found numerous bundles of methamphetamine, a small semi-automatic pistol, and over $4,000.

Officer Pamela Heidzig interviewed Smith while at Apartment No. 4. Heidzig testified that Smith stated that her boyfriend, who lived in Apartment No. 4, and the occupants of Apartment No. 7 used the same drug supplier. According to Smith, she had made drug deliveries for "El Gordo," who lived in Apartment No. 7. Smith also testified that Morreno lived with "El Gordo" and supplied narcotics for both apartments.

After Morreno's arrest, Officers Heath, Desler, and Kula approached Apartment No. 7. Heath testified that he knocked on the door, and Beltran-Hernandez opened it. The officers were in plain clothes with their badges displayed and their guns holstered. In Spanish, Officer Heath explained to Beltran-Hernandez that they were involved in a narcotics investigation, and requested to enter the apartment and speak with Beltran-Hernandez. Officer Heath testified that Beltran-Hernandez consented and opened the door completely allowing all of the officers to enter. According to the officers, Beltran-Hernandez appeared awake, sober, and unafraid.

The officers entered the living room and saw three adults and two small children. Officer Heath explained to everyone in Spanish why the officers were there. He told the residents that the officers had been conducting a narcotics investigation

across the hall and had obtained information that suggested that their apartment was also being used for narcotics distribution. He said that the officers wanted to search the apartment for drugs. Officer Heath asked who paid the rent for the apartment, and Beltran-Hernandez responded that he paid the rent.

Officer Heath asked Beltran-Hernandez for permission to search the apartment. He advised Beltran-Hernandez that he had a right to say "no." According to Officer Heath, Beltran-Hernandez consented to a search. Officer Heath obtained an Omaha Police Department consent-to-search form and filled out the Spanish version, explaining the form to Beltran-Hernandez. Officer Heath told Beltran-Hernandez that if he still wanted to give the officers permission to search his apartment, he could do so by signing the form. Officer Heath testified that Beltran-Hernandez then signed the form. Officers Desler and Kula began a search of the apartment. The officers found guns in the bedroom and a photograph of Morreno between the mattress and box springs. A scale and $10,000 were found in the freezer. However, no drugs were uncovered in Apartment No. 7.

After being read his *Miranda* rights, Beltran-Hernandez told the officers that he did not know why the money and scale were in the freezer but suggested that it was possible that the children had put them in there. He stated that he had earned the money from his work at a hotel. Officer Heath acknowledged during the search that it was not uncommon for illegal immigrants to deal only in cash.

Officer Heath believed he had no reasonable suspicion to detain Beltran-Hernandez after the interview, and the officers left without making an arrest in Apartment No. 7.[4] Later, based on the statements of Morreno and Smith, officers

---

[4] Officer Heath gave the consent to search form signed by Beltran-Hernandez to Officer Lang after the officers left Apartment No. 7. However, the police department has been unable to locate the form.

arrested Beltran-Hernandez for conspiracy to distribute and possession with intent to distribute methamphetamine. A federal grand jury indicted Morreno and Beltran-Hernandez on one count of conspiracy to distribute and possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 846 and subject to forfeiture, in violation of 21 U.S.C. § 853. Morreno was also charged with possession of a firearm during a drug-trafficking crime, in violation of 18 U.S.C. § 924(c), and possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1).

On May 29, 2002, the district court, adopting the report and recommendation of the magistrate judge,[5] denied Morreno's motion to suppress. The court denied Beltran-Hernandez's motion to suppress on September 4, 2002. Morreno entered a conditional plea of guilty–subject to his appeal of his motion to suppress–and was sentenced to 180 months' imprisonment. A jury found Beltran-Hernandez guilty of one count of conspiracy. The district court, on March 19, 2003, sentenced Beltran-Hernandez to 188 months' imprisonment on the conspiracy count.

## II.

### A. *Motion to Suppress - Morreno*

We review the district court's factual finding of consent for clear error. However, we review a denial of a motion to suppress de novo. *United States v. Zamoran-Coronel*, 231 F.3d 466, 468 (8th Cir. 2000). Morreno argues that the drugs found in his backpack should be suppressed because he did not consent to the search of the backpack. Morreno also contends that the information known to the officers at the time of the stop was insufficient to conduct a pat-down search of his person and that the encounter went beyond the scope of a valid investigatory stop.

---

[5] The Honorable Kathleen A. Jaudzemis, United States Magistrate Judge for the District of Nebraska.

If Morreno voluntarily consented, the police had authority to search Morreno's backpack even in the absence of probable cause or a search warrant. *United States v. Barahona*, 990 F.2d 412, 417 (8th Cir. 1993) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227–28 (1973)). The government bears the burden of proving a voluntary consent to search by a preponderance of the evidence. *Id.*

Morreno's consent was voluntary if it was the product of an essentially free and unconstrained choice, rather than the product of duress or coercion, express or implied. *Bustamonte*, 412 U.S. at 225, 227. The voluntariness of a consent is a question of fact to be determined from the totality of the circumstances surrounding both the environment of the encounter and the nature of the consenting party. *Id.* at 226–27. We consider a variety of factors[6] in determining voluntariness, but we do not apply those factors mechanically. *Zamoran-Coronel*, 231 F.3d at 469. "The inquiry turns on the totality of the circumstances, which must demonstrate that the police reasonably believed the search to be consensual." *Id.* After careful review of the record, we conclude that the district court's finding of voluntariness is not clearly erroneous.

Here, the magistrate judge, whose findings were adopted by the district court, found that Morreno voluntarily consented to the search of his backpack. When

---

[6] The following characteristics of persons giving consent are relevant when assessing the voluntariness of their consent: (1) their age; (2) their general intelligence and education; and (4) whether they consented after being informed of their right to withhold consent. In examining the environment in which consent was given, courts should ask whether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred. *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).

Morreno approached Apartment No. 7, Officer Clark conversed with Morreno in English. At no point during the conversation did Morreno indicate that he did not understand. Then, after being questioned only briefly, Morreno gave oral consent to the officers to search his backpack. Moreover, before the officers conducted the search, Officer Heath asked Morreno in Spanish if the officers could search the backpack. Again, Morreno agreed to the search.

Morreno's actions during the search support the conclusion that he voluntarily consented. Morreno placed the backpack on the ground for the officers to examine. Morreno was cooperative and did not attempt to flee. The district court found that Morreno was not threatened, physically intimidated, or punished before he consented. In this case, Morreno's words, gestures, and conduct support the district court's findings that this consent was the product of an essentially free and unconstrained choice by Morreno. "This conclusion is significant because a search may be justified by a voluntary oral consent even in the absence of a valid written consent." *Chaidez*, 906 F.2d at 382 (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988)). Thus, after review of the record, we conclude that the district court's finding that Morreno voluntarily consented was not clearly erroneous.

III.

A. *Motion to Suppress - Beltran-Hernandez*

Beltran-Hernandez first contests the district court's denial of his motion to suppress, arguing that he did not voluntarily consent to the search of his apartment. We find this argument unpersuasive. Applying the relevant factors, we find that Beltran-Hernandez's words, gestures, and conduct showed consent. *Barahona*, 990 F.2d at 418. Beltran-Hernandez appeared to be sober; was not threatened; was told that he could refuse consent; and read the Spanish consent-to-search form which stated he had the right to refuse consent of the search of his apartment.

Beltran-Hernandez cooperated with the officers. When Officer Heath explained (in Spanish) that the officers were involved in a narcotics investigation and wanted to speak with him, Beltran-Hernandez opened his apartment door completely and allowed the officers to enter. When the officers entered, Officer Heath explained to Beltran-Hernandez and the other occupants why the officers were there. Officer Heath asked Beltran-Hernandez if the officers could search the apartment for drugs, and Beltran-Hernandez orally consented. Beltran-Hernandez also signed a Spanish consent-to-search form. Beltran-Hernandez communicated with the officers during the search. After considering the totality of the circumstances, we conclude that the district court's finding that Beltran-Hernandez knowingly, intelligently, and voluntarily consented was not clearly erroneous.

## B. *Sufficiency of the Evidence*

Next, Beltran-Hernandez contends that the evidence was insufficient to support his conspiracy conviction, and the district court erred by refusing to grant his motion for judgment of acquittal. We disagree. When a judgment of acquittal is sought on the basis of insufficiency of the evidence we view the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences. *United States v. Smith*, 32 F.3d 1291, 1292 (8th Cir. 1994). "We reverse only if we conclude that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." *United States v. Ivey*, 915 F.2d 380, 383 (8th Cir. 1990).

To sustain a conviction for conspiracy to distribute methamphetamine, the government must prove beyond a reasonable doubt: 1) that there was an agreement to distribute methamphetamine; 2) that the defendant knew of the agreement; and 3) that the defendant knowingly participated in the conspiracy. *United States v. Nambo-Barajas*, 338 F.3d 956, 960–61 (8th Cir. 2003). The government may prove this agreement wholly by direct or circumstantial evidence. *United States v. Shoffner*, 71 F.3d 1429, 1433 (8th Cir. 1995).

-9-

Beltran-Hernandez argues that there was insufficient evidence to establish that he entered into an agreement to distribute 500 grams or more of methamphetamine, and therefore, the evidence cannot sustain his conviction for conspiracy to distribute methamphetamine. Viewed in the light most favorable to the verdict, we find that the government's evidence was sufficient to sustain the jury's verdict.

Beltran-Hernandez knowingly became part of a conspiracy to distribute methamphetamine. According to Smith, Beltran-Hernandez used the occupants of Apartment No. 4 to make drug deliveries and used their apartment to store his drugs. Smith also stated that Morreno lived with Beltran-Hernandez and supplied narcotics for both Apartment No. 7 and Apartment No. 4. A reasonable jury could have found beyond a reasonable doubt that Beltran-Hernandez and the occupants of Apartment No. 4 were involved in a conspiracy to distribute methamphetamine. Therefore, we affirm the district court's denial of Beltran-Hernandez's motions for judgment of acquittal.

## C. *Safety Valve of U.S.S.G. § 5C1.2*

Finally, Beltran-Hernandez asserts that the district court erred in refusing to reduce his sentence under the "safety valve" provision of U.S.S.G. § 5C1.2. We disagree. Under the "safety valve" exception, a drug defendant may be given a more lenient sentence if, among other things, the defendant demonstrates that he has truthfully provided to the government all information regarding the relevant crime before sentencing. *United States v. Velasquez*, 141 F.3d 1280, 1282 (8th Cir. 1998) (citing U.S.S.G. § 5C1.2(5)); *United States v. Romo*, 81 F.3d 84, 85–86 (8th Cir. 1996).

The "safety valve" provision required Beltran-Hernandez to provide the government with accurate information concerning his involvement in the conspiracy and his knowledge of those involved in the crime. At sentencing, the district court concluded that Beltran-Hernandez did not fully advise the government about his role

in the distribution conspiracy, and therefore was not entitled to the "safety valve" reduction. The court noted that Beltran-Hernandez continued to maintain his ignorance of the conspiracy. The district court concluded that Beltran-Hernandez had not "come clean" in his affidavit purporting to set forth his knowledge of the conspiracy. We conclude that the district court's finding is not clearly erroneous.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____