# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-2209

———————

United States of America,         *
                                     *

         Plaintiff - Appellee,     *

                                   *   Appeal from the United States

      v.                         *   District Court for the

                                   *   Southern District of Iowa.

Jose Adolfo Meza-Gonzalez,    *

                                   *

         Defendant - Appellant.   *

———————

Submitted: November 15, 2004
Filed: January 6, 2005

———————

Before MURPHY, HANSEN, and MELLOY, Circuit Judges.

———————

MURPHY, Circuit Judge.

A jury convicted Jose Adolfo Meza-Gonzalez of conspiracy to distribute methamphetamine and of attempt to possess methamphetamine with intent to distribute. The district court[1] sentenced Meza-Gonzalez to 188 months. On appeal Meza-Gonzalez argues that the district court erred in denying his motion to suppress evidence, allowing the prosecutor to strike the only minority member of the jury panel, and enhancing his sentence. We affirm.

———————

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

On the morning of October 27, 2003, law enforcement officers arrested Juan Jose Ramirez at the Omaha bus station after they discovered methamphetamine in his travel bag (2,722.3 grams of methamphetamine mixture or 408 grams of actual methamphetamine). Ramirez told the officers that he was traveling to Des Moines to deliver the drugs to a man named Adolfo or Alfred whom he described as a clean cut Hispanic male in his late twenties with short black hair, approximately five feet eight inches tall, and weighing 150 pounds. Ramirez reported that Adolfo was going to meet him at the Des Moines bus station and that he drove a gray Chevrolet van. He also stated that Adolfo lived either in a blue house near East 30th Street and University or in a white house two blocks from University and close to a Family Dollar Store. Because Ramirez was only sixteen years old, the officers did not use Ramirez in a controlled delivery.

The officers contacted the United States Immigration and Customs Enforcement (ICE) and the Drug Enforcement Administration (DEA) in Des Moines, and surveillance was set up at the bus station where the bus was scheduled to arrive at approximately 2:40 p.m. A gray Chevrolet van arrived at the station at approximately 2:55 p.m., and a check of its license plates showed that it was registered to Jose Adolfo Meza. Officers saw two Hispanic males in the van. The man in the passenger seat, later identified as Leonel Gonzalez-Salgado, walked into the bus station and returned alone. The van then left the station, and officers followed it to a house located at 1623 East 14th Street and then to a nearby Family Dollar store. As the van left the store, the DEA requested that a marked police car stop it. The officer who stopped the van advised the driver that his gas tank lid was open. The van was being driven by Jose Adolfo Meza-Gonzalez, who produced a valid driver license from Oregon and said that he resided at the house on East 14th Street. The officer arrested Meza-Gonzalez because he was unable to provide proof of insurance.

After the arrest, officers went to Meza-Gonzalez's residence without a search warrant. ICE Agent Neil Marley knocked on the door, and Maribel Salgado-Alamilla

answered. She is the common law wife of Meza-Gonzalez and the mother of his two children. Agent Marley is fluent in Spanish and spoke with Salgado-Alamilla in that language since it appeared she did not speak English. Marley identified himself as a federal officer and asked her if anyone else was present in the residence. She responded that only she and her two children, aged 2 and 3, were at home. According to Salgado-Alamilla, Marley asked her if the officers could verify that no one else was in the house; she agreed and allowed them to enter the residence.

Marley informed Salgado-Alamilla that they were conducting an investigation regarding narcotics, read her Miranda rights, and asked for consent to search the residence. Salgado-Alamilla said that she did not want the officers to search the home because her husband was not present, and Marley told her that Meza-Gonzalez had been arrested and was in custody. Marley testified that she then consented to a search of the residence, but Salgado-Alamilla claims that she never gave consent.

Five or six officers searched the house while Salgado-Alamilla sat on a couch. She testified that the officers separated her from her two young children and threatened to take them from her permanently and deport her if she did not give them the names of other people involved in drugs. She also testified that Marley told her that Miranda rights would be of little value to her because she was an illegal alien. Marley testified that the officers never separated the children from their mother, but he admitted that toward the end of the search he told her she could be deported. He also said that he was not going to detain her that evening because she had two small children and was pregnant.

During the search officers seized narcotics packaging material in one of the bedrooms, in the oven in the kitchen, and on the basement floor. The materials in the basement tested positive for methamphetamine. They also seized a digital scale and $5300 in cash from Salgado-Alamilla's purse. She told the officers that she knew

nothing about the money, but she later testified at the suppression hearing that the money was from the sale of her husband's truck.

A grand jury indicted Meza-Gonzalez on charges of conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine and of attempt to possess with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Meza-Gonzalez moved to suppress evidence obtained from the search of his residence on the ground that his wife had not consented to it.

The district court denied the motion, and the jury convicted Meza-Gonzalez on both counts. The court imposed concurrent sentences of 188 months. In determining the amount of methamphetamine attributable to Meza-Gonzalez, the district court relied on the trial testimony of Ramirez, who said that he had made two deliveries to Meza-Gonzalez totaling about twelve pounds prior to his interception in Omaha with a large amount in October 2003.

Meza-Gonzalez appeals his conviction and sentence and seeks a new trial or resentencing. He claims that the district court erred in denying his motion to suppress because Salgado-Alamilla had not consented to the search, that the district court erred in allowing the government to exercise a peremptory strike of the only minority juror on the jury panel, and that the district court violated his Fifth and Sixth Amendment rights by enhancing his sentence based on drug quantities that were not found by the jury, admitted by him, or charged in the indictment.

We review the district court's factual finding of consent for clear error and review de novo the denial of the motion to suppress. United States v. Morreno, 373 F.3d 905, 910 (8th Cir. 2004).

In considering the motion to suppress, the district court weighed the conflicting testimony of Agent Marley and Salgado-Alamilla and determined that Marley's testimony was more credible. The court noted that there was no evidence in the record to suggest that Marley would testify falsely but that Salgado-Alamilla had a motive to do so. The court also found that Salgado-Alamilla's testimony about what the officers said to her was greatly embellished and undermined her credibility. The court found that Salgado-Alamilla voluntarily consented to the search and that she had not attempted to withdraw or limit that consent at any time.

Meza-Gonzalez argues on appeal that the court erred in finding that Salgado-Alamilla gave voluntary, unrestricted consent to search the residence. He contends that the court clearly erred in crediting Marley rather than Salgado-Alamilla and that Marley's claim of voluntary consent is implausible because of Salgado-Alamilla's immigration status, her inability to speak English, her need to attend to her young children while the six officers were in her home, and her unrefuted initial refusal to allow a search when her husband was not at home. Meza-Gonzalez also contends that the absence of written consent is strong evidence against a finding of consent because the officers had time and opportunity to present a written consent form to Salgado-Alamilla, and it was DEA policy to do so.

A consensual search does not violate the Fourth Amendment if the consent was given voluntarily and without coercion. United States v. Martinez, 168 F.3d 1043, 1046 (8th Cir. 1999). The government bears the burden of proving voluntary consent by a preponderance of the evidence. Morreno, 373 F.3d at 910; see Bumper v. North Carolina, 391 U.S. 543, 548 (1968). The scope of consent is measured under a standard of objective reasonableness, and we look at what the typical reasonable person would have understood from the exchange with the officer. Florida v. Jimeno, 500 U.S. 248, 251 (1991); United States v. Adams, 346 F.3d 1165, 1171 (8th Cir. 2003). Determination of consent necessarily involves judging the credibility of witnesses, a task generally left to the district court. United States v. Welerford, 356

F.3d 932, 935 (8th Cir. 2004). As the Supreme Court has stated, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson v. Bessemer City, 470 U.S. 564, 575 (1985); see Welerford, 356 F.3d at 935-36.

Given the strong weight accorded the district court's credibility determinations and the absence of extrinsic evidence contradicting Marley's testimony, it was not clearly erroneous for the district court to find that Salgado-Alamilla consented to the search of the residence. In addition to his testimony about her consent, Marley testified that Salgado-Alamilla was able to see much of the progress of the search from her place on the couch and that she did not object to the search at any time. See United States v. Alcantar, 271 F.3d 731, 738 (8th Cir. 2001) (failing to object to the continuation of a consent search makes the continued search objectively reasonable).

We examine the totality of the circumstances in determining whether consent was given voluntarily, including the nature of the encounter and the characteristics of the consenting party. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990). Relevant facts include (1) the individual's age; (2) her general intelligence and education; (3) whether she was under the influence of drugs or alcohol; (4) whether she was informed of her Miranda rights prior to any consent; and (5) whether she had experienced prior arrests and was thus aware of the protections the legal system affords suspects. United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997).

A review of the record shows that the district court's consent finding was not clearly erroneous. Salgado-Alamilla was twenty eight years old, Marley informed her of her Miranda rights, and nothing in the record suggests that she was under the influence of drugs or alcohol. Although Salgado-Alamilla did not speak English,

Marley was fluent in Spanish and testified that they had no problems communicating with each other. The district court credited Marley's testimony that the officers did not take Salgado-Alamilla's children away from her, limit her Miranda rights, or threaten to deport her if she did not cooperate. We conclude that the district court did not err in denying Meza-Gonzalez's motion to suppress.

Meza-Gonzalez also contends that his constitutional rights were violated by the government's use of a peremptory strike to remove the only racial minority from the jury panel. See Batson v. Kentucky, 476 U.S. 79 (1986). Under the Batson framework, the opponent of a peremptory challenge by the government must make a prima facie case of discrimination. The burden then shifts to the government to produce a race neutral explanation for the strike. If it expresses a race neutral reason, the court must then decide whether its real reason was based on race. Batson, 476 U.S. at 97-98. The question may be framed in terms of pretext, that is whether the neutral reason advanced is only pretextual, but "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett v. Elem, 514 U.S. 765, 767-68 (1995). We review a district court's Batson findings for clear error. Miller v. United States, 135 F.3d 1254, 1256-57 (8th Cir. 1998).

During jury selection, the government struck Jana Bragg, a black woman and the only racial minority on the jury panel. The court asked Bragg general questions during voir dire, including what she did for a living. She responded that she was a tech at a group home that served mentally challenged and physically disabled clients, even though she had stated on her jury questionnaire that she was a teacher. After the government executed its peremptory strikes and struck Bragg, defense counsel challenged that strike, arguing that it had been based on Bragg's race. The court asked the government its reason for the strike, and the prosecutor responded that the reason was because Bragg worked in the "social worker realm" and pointed out that she had also stricken the only other person on the panel who worked in the social

work field. In addition the prosecutor stated that Bragg's jury questionnaire appeared to have been filled out hurriedly without time or attention and that she had "extremely long fingernails, probably over an inch in length, with multiple colors on them, which would also tend to make her more liberal rather than conservative and for that reason not a good juror for the prosecution."

Defense counsel noted that the prosecutor had not stricken other teachers from the panel and asserted that African American women are more likely to have long, brightly colored fingernails. The prosecutor responded that in her personal experience, colored fingernails are not an indication of race but rather of a liberal nature. The district court denied the challenge, stating that the government only had to come forward with a nondiscriminatory reason for the strike, that the prosecutor had done so, and that the reason given was not pretextual.

Meza-Gonzales now argues that the district court erred because it did not analyze all three reasons given by the prosecution, but simply rejected the Batson challenge on the basis of one of the reasons. He contends that the government violates Batson any time race is improperly considered when striking a juror even if other nondiscriminatory reasons are offered for the strike. Meza-Gonzalez argues that long, brightly colored fingernails are stereotypically associated with black women and that striking the juror on this basis was the same as striking her based on race.

Meza-Gonzalez has presented no evidence to show that black women are more likely to have long, multicolored fingernails, and there is no evidence in the record to suggest that such fingernails are a racial indicator. There is also nothing to suggest that the prosecutor's observation about Bragg's jury questionnaire was based on race, and the prosecutor struck the other juror who worked in a social work setting. Having reviewed the record, we find that the district court did not clearly err in finding no purposeful racial discrimination or in rejecting Meza-Gonzalez's Batson challenge.

For these reasons, we affirm the judgment of the district court.[2]

_____

[2]Meza-Gonzalez also argues that the district court committed plain error by enhancing his sentence using drug quantities not found by the jury, admitted by the defendant, or charged in the indictment, citing Blakely v. Washington, 124 S. Ct. 2531 (2004). The government argues that Blakely does not apply to the federal sentencing guidelines but even if it did, Meza-Gonzalez has not demonstrated plain error because he has not shown that the error seriously affected the "fairness, integrity, or public reputation of [the] judicial proceedings." See United States v. Cotton, 535 U.S. 625, 632-33 (2002). Since any ruling on these points would be premature before the Supreme Court decides its pending cases with Blakely issues, we decline to consider them at this time. See Administrative Order Regarding Blakely Cases, United States Court of Appeals for the Eighth Circuit, Sept. 27, 2004.