# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-1747

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| | * |
| v. | * |
| | * |
| Shawn Leo Barth, | * |
| | * |
| Defendant - Appellant. | * |


_____

No. 04-1609

_____

Appeal from the United States
District Court for the
District of North Dakota

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Rosalio Guitron-Vargas, also known | * |
| as Gregorio Arechigo Velasco, also | * |
| known as Josue Efrain Nino, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 04-1681

_____

United States of America,          *
                                   *
        Plaintiff - Appellee,      *
                                   *
        v.                         *
                                   *
Nancy Elizabeth Ferneau            *
                                   *
        Defendant - Appellant.     *

_____

Submitted: November 17, 2004
Filed: September 14, 2005

_____

Before MURPHY, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

This action is a consolidated appeal following the convictions of Shawn Leo Barth, Rosalio Guitron Vargas, and Nancy Elizabeth Ferneau. Each individual was found guilty of conspiracy to distribute and to possess with intent to distribute methamphetamine. Barth was also found guilty of possession with intent to distribute methamphetamine, distribution of methamphetamine, possession of marijuana with intent to distribute, possession of a firearm in furtherance of a drug trafficking crime,

-2-

and being a felon in possession of a firearm or ammunition. In addition, Vargas was found guilty of distribution of methamphetamine, distribution of marijuana, and possession of a firearm by an illegal alien.

The consolidated appeals raise overlapping issues. Barth argues that: 1) the evidence established multiple conspiracies while the indictment alleged a single conspiracy; 2) the evidence was insufficient to support the conspiracy conviction; and 3) Blakely v. Washington, 124 S.Ct. 2531 (2004), requires the facts of his past convictions be submitted to the jury if they are used to enhance his sentence. Vargas argues that: 1) the evidence established multiple conspiracies, but the indictment alleged a single conspiracy; 2) the district court violated his rights under Federal Rule of Criminal Procedure 43 when it conducted a status conference outside of his presence; and 3) the district court erred when it failed to admonish the jury not to discuss the case when it recessed. Ferneau argues that: 1) the evidence was insufficient to support the conspiracy conviction; 2) the district court violated her rights under Federal Rule of Criminal Procedure 43 when it conducted a status conference without her present; 3) the court erred when it failed to admonish the jury not to discuss the case when it took recesses; and 4) the court erred in refusing to give Ferneau a minor participant reduction at sentencing. In addition, this court asked for supplemental briefing from all of the defendants regarding possible Blakely claims. We affirm the judgment of the district court in each appeal.[1]

I. Background

This case arises out of an alleged conspiracy to distribute drugs, in particular methamphetamine, in the Bismarck, North Dakota area. Viewing the evidence in a light favorable to the government shows the following. Initially, the drugs were

_____

[1]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

obtained in Iowa, but eventually they were brought into North Dakota from Washington state. The distribution activity principally involved Shawn Barth, Rosalio Vargas, Nancy Ferneau, and persons they employed to transport drugs on their behalf. The defendants purchased methamphetamine and marijuana to sell in Bismarck and the surrounding area. Ferneau often permitted her residence to be used as a distribution point. These events occurred between 1999 and 2003.

Barth's efforts to distribute methamphetamine in Bismarck began when he and Blaine Martinez purchased methamphetamine in Iowa and transported it to Bismarck. On each trip, they purchased one pound of methamphetamine. Upon returning to North Dakota, they divided the drugs into smaller quantities, distributed them, and split the proceeds.

In February 2000, Martinez informed Barth that Vargas had methamphetamine available for purchase. Barth met Vargas at Nancy Ferneau's home in Bismarck, where Martinez also resided at that time. Martinez and Barth purchased methamphetamine from Vargas at this meeting, and approximately four or five other times between February 2000 and April 2000, in one pound quantities.

In May 2000, Vargas hired Rigoberto Fernandez-Castillo ("Fernandez") to transport methamphetamine and marijuana from Washington state to Bismarck for later sale by Barth and Ferneau in exchange for $1,000 per trip. Vargas supplied the vehicles for the transportation of the drugs.

Fernandez subsequently made eight trips between Washington and North Dakota, and was accompanied by Vargas on three of them. On each trip he transported two pounds of methamphetamine and three to five pounds of marijuana. Vargas told Fernandez to bring the drugs to Ferneau's home so that Ferneau could assist in distributing the drugs from there. Each time, Fernandez brought the drugs to Ferneau's home. After Fernandez transported the drugs to Ferneau's home,

Ferneau assisted Fernandez in dividing the drugs. Ferneau would then make telephone calls, and shortly thereafter individuals would come to pick up the drugs. Ferneau would provide various buyers with marijuana, methamphetamine, or both. During this process, Fernandez never witnessed the actual exchange of drugs between Ferneau and Barth. However, he did observe Barth enter Ferneau's home and go into the room where the drugs were kept. Fernandez also witnessed exchanges of drugs, weapons, and other items between Vargas and Barth. After all of the drugs were sold, Ferneau would pay Vargas for the drugs. On some occasions Vargas would arrange for Fernandez to bring the money back to Vargas's home in Washington.

Vargas, Barth, and Ferneau continued to obtain and distribute drugs throughout 2000. Fernandez continued to act as courier until his arrest for transporting drugs in September 2000.

On April 5, 2001, Vargas was arrested in Mandan, North Dakota. He was prosecuted for an immigration violation and deported on June 29, 2002. Vargas returned to the United States later that summer. Upon his return, Vargas and Barth immediately resumed distributing methamphetamine.

The following year, Barth moved from Bismarck to Oliver County, North Dakota. There, Barth moved in with a dairy farm worker named William Canada. Barth brought Vargas and another Hispanic male with him to Canada's residence. Barth "fronted Canada" methamphetamine, meaning Canada had to sell the methamphetamine and then repay Barth from the proceeds. In November 2002, Canada was arrested on unrelated charges. Canada gave Barth the keys to his residence to return to the property owner. Instead of returning the keys, Barth moved into the residence in Oliver County.

Barth continued to distribute methamphetamine from Canada's residence. In March 2003, Barth sought the assistance of James Chrisikos to distribute

methamphetamine. Barth offered to provide Chrisikos a vehicle and money if he sold drugs for Barth. Barth showed Chrisikos around the Canada residence. He showed him a utility trailer where he kept marijuana, methamphetamine, and a handgun.

On approximately March 24, 2003, Chrisikos, Ryan Brelje, and another man sought to purchase methamphetamine from Barth. Chrisikos went to the residence to make the purchase. When he arrived, he saw a white minivan outside the residence and Barth meeting with two people. During the meeting, Barth and the two people exchanged something. Following the exchange, Barth entered Chrisikos's vehicle and gave Chrisikos a package of methamphetamine. He told Chrisikos that the drugs had just arrived and that he had paid ten to fifteen thousand dollars for the drugs. Barth gave Chrisikos one ounce of methamphetamine and some marijuana for his personal use and told Chrisikos to assist in distributing the rest of the drugs Barth had purchased.

Soon after this purchase, the police detained Ryan Brelje. At that time, Brelje was in possession of approximately ten grams of methamphetamine. Brelje told the police about Chrisikos and his role in the distribution of methamphetamine. Based on this information, the police obtained a search warrant for Chrisikos's residence. At the residence the police found marijuana and methamphetamine. Following the search, the police interviewed Chrisikos.[2] Chrisikos told the police about Barth, the Oliver County residence, the drugs, the trailer, and the handgun.

Based on the information from Chrisikos, the police pursued Barth and Vargas. The police executed a search warrant on Canada's residence, where Barth was living. Inside the utility trailer Barth had shown to Chrisikos, officers found a handgun and

---

[2]Chrisikos was informed that the police had a warrant for his arrest at a previously scheduled meeting with his probation officer. He was then detained until the search was completed.

ammunition, marijuana, and other drug paraphernalia. The trailer belonged to B & B Roofing, a business run by Barth's brother, for which Barth periodically worked. Inside the residence and a pickup truck at the residence, the officers found marijuana, methamphetamine and titles to cars purportedly involved in the distribution of the drugs. The next day, Deputy Sheriff Dion Bitz stopped Vargas in one of the cars for which officers had found title in their search of the residence. When questioned, Vargas claimed that the car belonged to his nephew, Juan Quintero, and that he did not know Barth. Vargas admitted that he was in the United States illegally.

On July 9, 2003, Barth, Vargas, Ferneau, Fernandez, and Thomas Pinks, Jr. were named in a multi-count indictment. The first count alleged that between August 1, 1999 and the date of the indictment, the defendants and "others" conspired to possess methamphetamine with an intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. Counts two through six alleged that Barth: 1) possessed methamphetamine mixture with intent to distribute; 2) actually distributed methamphetamine; 3) possessed marijuana with an intent to distribute; 4) possessed a firearm in furtherance of a drug trafficking crime; and 5) was a felon in possession of a firearm and ammunition. 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2; 18 U.S.C. § 924(c)(1)(A) and (2); 18 U.S.C. § 922(g)(1); 18 U.S.C. § 924(a)(2) and (e). Counts seven through nine alleged that Vargas distributed methamphetamine and marijuana and unlawfully possessed a firearm based on his status as an illegal alien in the United States. 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2; 18 U.S.C. § 922(g)(5)(A); 18 U.S.C. § 924 (a)(2).

The case proceeded to trial on December 8, 2003.[3] A pretrial conference regarding how the trial would proceed was held on December 5, 2003, outside of the presence of the defendants. The defendants objected to their absence. The jury

---

[3]The case against Fernandez did not proceed to trial. The government and Fernandez entered into a plea agreement in exchange for his testimony.

returned a verdict on December 18, 2003. All of the defendants except Pinks, who was acquitted, were convicted on all counts of the indictment.

II. Discussion

A. Conspiracy Participation

Appellants Barth and Vargas assert that they were prejudiced by a variance between the government's indictment that alleged a single conspiracy and the evidence offered at trial which they allege showed multiple conspiracies. According to these defendants, they were charged with one conspiracy that existed continuously from August 1, 1999 until July 9, 2003, but the evidence presented at trial supported the existence of multiple conspiracies. Barth suggests that the evidence indicates the existence of at least three separate conspiracies, while Vargas alleges that the evidence shows at least two separate conspiracies.

We are not convinced that there were multiple conspiracies. In fact, significant evidence exists to suggest the existence of a single conspiracy, involving the same drugs and substantially the same people, that lasted several years. Regardless of whether there was a single conspiracy or multiple conspiracies, "[w]e will reverse only if we find the evidence adduced at trial does not support a finding of a single conspiracy, and we determine [the defendants were] prejudiced by the variance." United States v. Benford, 360 F.3d 913, 914 (8th Cir. 2004).

We review allegations of a variance for harmless error, and "[r]eversal is warranted only if the variance infringed a defendant's substantial rights." Fed. R. Crim. P. 52(a); see United States v. Ghant, 339 F.3d 660, 662 (8th Cir. 2003), cert. denied, sub nom Nichols v. United States, 540 U.S. 1167 (2004). A variance infringes a defendant's substantial rights when:

(1) the defendant could not reasonably have anticipated from the indictment the evidence to be presented against him; (2) the indictment is so vague that there is a possibility of subsequent prosecution for the same offense; or (3) the defendant was prejudiced by a 'spillover' of evidence from one conspiracy to another.

United States v. Jones, 880 F.2d 55, 66 (8th Cir. 1989).

Here, any variance that may have occurred did not infringe on the substantial rights of either Barth or Vargas. Neither defendant alleges notice or double jeopardy claims. When there are not notice or double jeopardy issues, "a variance between the indictment date and the proof at trial is not fatal so long as the acts charged were committed within the statute of limitations period, and prior to the return date of the indictment." United States v. Stuckey, 220 F.3d 976, 982 (8th Cir. 2000). Barth and Vargas did not raise a statute of limitations issue and all of the activities occurred before the indictment was handed down. Thus, the only possible issue in this case is whether the defendants were prejudiced by the spillover of evidence, that is to say the jury's inference of guilt based on evidence not related to that defendant's conspiracy.

Only Barth raises an allegation of prejudice from the spillover of evidence. However, he faced little or no risk of prejudice from spillover evidence because he was involved in all stages and aspects of the crimes committed. Regardless of how many conspiracies the government alleged were committed, it presented evidence that Barth was involved in all of them. See, e.g., Ghant, 339 F.3d at 664 (noting that even if there were multiple conspiracies, sufficient evidence supported a finding that the defendant participated in all of them). He cannot contend that he was prejudiced by his own actions. Barth "cited no case in which, despite evidence that the defendant participated in all of the conspiracies, a variance between the number of conspiracies charged and the number proven was found to have prejudiced the defendant." Id. Even if there were multiple conspiracies in this case, "they were close in time and similar to each other," and thus evidence of Barth's participation likely would have

been admitted under Federal Rule of Evidence 404(b) because it "would have been probative of his intent to participate in the other [conspiracy]." Ghant, 339 F.3d at 664.

Barth cites Kotteakos v. United States, 328 U.S. 750, 776-77 (1946), for the proposition that prejudice existed. In Kotteakos, the Court found that prejudice existed because the district court failed to give sufficient instruction to prevent the jury from imputing to each defendant the acts and statements of the other defendants. Id. at 771, 776-77. In that type of situation there is a danger "of transference of guilt from one to another across the line separating conspiracies." Id. 774. The case before us is distinguishable from Kotteakos because the district court gave a specific cautionary instruction and because the conspiracy in this case was not as complex as the situation in Kotteakos. This case involved fewer participants and fewer degrees of attachment to comprehend and consider.

The possibility of prejudice is diminished by characteristics of this case that make it not "a particularly 'complex' one or one dealing with 'complicated or confusing' transactions." Ghant, 339 F.3d at 663 (quoting United States v. Hall, 171 F.3d 1133, 1150-51 (8th Cir. 1999)). The evidence in this case was easy to compartmentalize into certain time periods. All possible conspiracies involved the same drugs, locations of supply, means of transportation, and points of distribution. Barth's participation in the conspiracy, in particular, is easy to identify and separate from that of the other conspirators.

Even if we believe there was a risk of prejudice, we are confident that the limiting instruction in this case "prevented the jury from [improperly] transferring guilt . . . ." United States v. Snider, 720 F.2d 985, 990 (1983). The district court gave the instruction from the Eighth Circuit Model Jury Instructions. See Eighth Circuit Manual of Model Jury Instructions - Criminal § 5.06(G) (West 2003) (instructing juries in cases dealing with single or multiple conspiracies to compartmentalize

evidence).  We believe this instruction conveyed the law of our Circuit as set forth in United States v. Jackson, 696 F.2d 578, 585-86 (8th Cir. 1982).  The use of this instruction provided strong protection against prejudice from any spillover of evidence.

Finally, the argument that the jury was confused, or Barth was prejudiced, by the spillover of evidence is weakened by the fact that the jury found one defendant, Thomas Pinks, not guilty.  Combined with the cautionary instruction, this verdict shows that the jury was able to compartmentalize the evidence against each defendant.  Accordingly, we conclude that, in this case, even assuming a variance, none of the defendants were prejudiced by it.

B.  Sufficiency of the Evidence

Barth and Ferneau allege the evidence is insufficient to support their convictions.  The applicable standard of review is "very strict."  United States v. Sanders, 341 F.3d 809, 815 (8th Cir. 2003).  When examining the sufficiency of the evidence, we review the evidence in a light most favorable to the verdict.  United States v. Tensley, 334 F.3d 790, 793 (8th Cir. 2003).  Accordingly, if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we must uphold the conviction.  Miller v. Lock, 108 F.3d 868, 870 (8th Cir. 1997); United States v. Dabney, 367 F.3d 1040, 1042 (8th Cir. 2004) (stating that the jury's decision should be reversed "only if no reasonable jury could have found [the defendant] guilty").  "We resolve evidentiary conflicts in favor of the government and accept all reasonable inferences drawn from the evidence that support the jury's verdict."  Tensley, 334 F.3d at 794.

Ferneau contends that there is no credible evidence that a reasonable jury could find sufficient to prove beyond a reasonable doubt that she knew the purpose of the conspiracy.  Ferneau argues that although the jury determines the credibility of

witnesses, no reasonable jury could have believed the testimony of Fernandez and James Rhone, who also helped transport drugs for the conspiracy. In particular, Ferneau points to Rhone's statements that, at all costs, he was not going back to jail. She also points to the fact that Fernandez made a deal with the prosecution to testify in exchange for a plea agreement. Moreover, she asserts that she presented evidence that she was not involved with methamphetamine.

The evidence in this case supports the jury's finding that Ferneau knew the purpose of the conspiracy and knowingly joined the conspiracy to distribute methamphetamine. The jury had the opportunity to hear conflicting testimony regarding Ferneau's knowledge. Martinez and a number of other people involved with the defendants testified that Ferneau lacked knowledge. The government offered the testimony of Fernandez and Rhone as to Ferneau's knowledge of, and participation in, the conspiracy. In particular, Fernandez testified regarding how he transported methamphetamine to Ferneau's house where Ferneau and Fernandez would divide up the drugs for distribution and how Ferneau would call individuals to pick up the drugs from her residence.

The government also offered numerous exhibits corroborating the testimony of Fernandez and Rhone. The government produced statements by Ferneau to a DEA agent in which Ferneau admitted her knowledge of Vargas' and Fernandez's involvement in drug trafficking. The government also presented her admission that she purchased cellular phones for Fernandez and Vargas. Further, the government presented Ferneau's admission that she attempted to retrieve, at Vargas's request, the car in which Fernandez was arrested that contained methamphetamine.

It is not the province of this court to weigh the evidence for and against Ferneau. Rather, we give significant weight to the jury's determinations as to the credibility of witnesses. United States v. Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2005). Taking the evidence in a light most favorable to the verdict, the witness

testimony and other exhibits constitute enough evidence to find, as the jury did, that Ferneau knew the purpose of the conspiracy.

Barth contends that there is insufficient evidence to convict him of: 1) possession of methamphetamine with intent to distribute; 2) distribution of marijuana; 3) possession of marijuana with intent to distribute; 4) possession of a firearm in furtherance of a drug trafficking crime; and 5) being a felon in possession of a firearm and ammunition. Barth, like Ferneau, is merely asking this Court to reweigh the evidence presented at trial and evaluate the credibility of witnesses, which it is not our place to do. Id. The jury had the opportunity to evaluate the credibility of witnesses against Barth, including Chrisikos, and the merit of the evidence presented. As we stated earlier, we give significant weight to the jury's determinations regarding witness credibility. Id. The government presented additional evidence to corroborate Chrisikos's testimony, including physical evidence from the Canada residence and Chrisikos's apartment. These items included detailed accounts of Chrisikos's partners, amounts of drugs and money, and locations of guns and cars, all relevant to Barth's participation. Moreover, the government offered the testimony of others familiar with Barth's purchase and distribution of methamphetamine and marijuana, including Raymond Kershaw and Leslie Beneke Schmidt. Again, the jury was able to make credibility determinations regarding the testimony of these witnesses, and we give significant deference to its evaluation. Taking the evidence in Barth's case in a light most favorable to the verdict, there was more than enough evidence to convict Barth.

C. Sixth Amendment Right to Be Present at Trial

We review whether a trial court conducted a proceeding in violation of defendants' right to be present during every stage of his trial under an abuse of discretion standard. United States v. Shepherd, 284 F.3d 965, 967 (8th Cir. 2002).

If a proceeding was conducted in violation of this right, it is subject to harmless error analysis. Id. at 967-68.

A criminal defendant has a constitutional right to be present during every stage of his trial. U.S. Const. amend. VI; Illinois v. Allen, 397 U.S. 337, 338 (1970). However, "[t]he right to be present at all phases of a criminal trial is not absolute." Shepherd, 284 F.3d at 967. This right and its limitations have been codified in Rule 43 of the Federal Rules of Criminal Procedure. Rule 43(b)(3) states that "[a] defendant need not be present . . . [during a] proceeding [which] involves only a conference or hearing on a question of law." Id. Therefore, the defendant's presence is not required at a conference regarding trial procedure. See, e.g., Cox v. United States, 309 F.2d 614, 616 (8th Cir. 1962) ("It is not unusual for a judge to call counsel into chambers and discuss matters of evidence, the form of questions, instructions proposed, and other matters looking to a more orderly trial, without having a defendant present."). These types of discussions are "not part of the trial within the meaning of Rule 43." Id.

Vargas and Ferneau assert that they should have been present because factual issues were discussed and because the discussion regarding potential witnesses constituted a discussion of factual issues. In this case, the pretrial proceeding involved discussion of: 1) the voir dire procedure to be followed by the court; 2) production of the government's witness and exhibit lists to the Court by the start of trial; 3) the amount of time required for opening statements and the daily trial schedule; 4) the procedure for handling objections to trial evidence by one or more defendants; and 5) parties' objections to the court's proposed jury instructions. No testimony was heard or discussed, and no decisions regarding the admissibility of evidence nor objections to jury instructions were made. Appellants' argument fails because the conference only concerned how to conduct the trial in an orderly manner. It did not involve a discussion of questions of fact. Accordingly, the pretrial

conference addressed questions of law, thereby making the defendants' presence unnecessary. Fed. R. Crim. P. 43(b)(3).

D. Jury Separation

Vargas and Ferneau also argue that the district court committed error when it occasionally failed to admonish the jury not to discuss the case among themselves or with others.

> It is essential to a fair trial, civil or criminal, that a jury be cautioned as to permissible conduct and conversations outside the jury room. . . . It is fundamental that a jury be cautioned from the beginning of a trial and generally throughout to keep their considerations confidential and to avoid wrongful and often subtle suggestions offered by outsiders.

United States v. Williams, 635 F.2d 744, 745-46 (8th Cir. 1980). Nevertheless, this Court stated in Kleven v. United States, 240 F.2d 270, 274 (8th Cir. 1957), that "[w]hile this Court has pointed out the vital importance of proper admonitions to a jury . . . we have never held . . . that such admonition must be repeated at every recess, and we do not believe it is error to fail to do so when, as here, the Court had earlier given a continuing admonition to the jury." In the present case, the district court admonished the jury on numerous occasions. It is uncontested that the court warned the jury on at least twenty occasions, but did not do so on at least eleven occasions. The instances in which the jury was not given an admonition only occurred during mid-morning or mid-afternoon recesses when the jury did not leave the courthouse. There is no claim of prejudice from failure to admonish the jury before an overnight separation.

We held in United States v. Weatherd, 699 F.2d 959, 962 (8th Cir. 1983), and United States v. McGrane, 746 F.2d 632, 635 (8th Cir. 1984), that repeated admonitions, even if not given in every instance, adequately cautioned the jury as to

-15-

its obligations. We stated that "[i]n light of the repeated admonitions, we are satisfied that the jurors were adequately apprised of their duty not to discuss the case outside the jury room." Weatherd, 699 F.2d at 962; see McGrane, 746 F.2d at 635 (finding that ten admonitions "adequately cautioned the jury concerning its obligations"). We cannot say that there was prejudice in this case. The jurors were sufficiently apprised of their duty such that the district court's failure to admonish the jury on every occasion does not constitute reversible error.

E. Minor Participant Reduction

Ferneau argues that the court erred in refusing to give a minor participant reduction upon sentencing. We review a district court's determination regarding a defendant's role in an offense for clear error. United States v. Brubaker, 362 F.3d 1068, 1070 (8th Cir. 2004).

A trial judge may reduce a defendant's offense level by two levels if the court finds that the defendant was a minor participant in a conspiracy. U.S.S.G. § 3B1.2. A "minor participant" is someone who is "less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. 5. The burden is on the defendant to prove she is eligible for the reduction. Brubaker, 362 F.3d at 1071. The fact that a defendant is less culpable than other participants in a crime does not mean the defendant is entitled to a minor role reduction. United States v. Johnson, 358 F.3d 1016, 1018 (8th Cir. 2004).

Ferneau was not a minor participant. The record indicates that: Ferneau was actively involved in the conspiracy to distribute methamphetamine; her home was a distribution center for the drugs; she provided resources – such as cellular telephones – to assist in the conspiracy; she weighed, cut, and packaged drugs; and she collected money on behalf of the methamphetamine supplier. This evidence suggests that Ferneau's actions could reasonably be found to constitute more than minor

-16-

participation in the drug conspiracy. Accordingly, the district court's determination that Ferneau was not entitled to a minor participant reduction does not constitute clear error.

F. Booker

In Blakely v. Washington, the Supreme Court held that the imposition of a sentence enhancement above the State of Washington's Sentencing Reform Act's range, based solely on the factual findings of the sentencing judge, violated the defendant's Sixth Amendment rights. Blakely, 124 S. Ct. at 2537. It constituted a Sixth Amendment violation because the findings were neither admitted by the defendant nor found by a jury beyond a reasonable doubt. Id. Following Blakely, and while this appeal was pending, the Court held in United States v. Booker, 125 S.Ct. 738 (2005), that "the Sixth Amendment as construed in Blakely does apply to the [Federal] Sentencing Guidelines." Id. at 746. Under the Booker regime, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by . . . a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at 756.

In this case, Barth and Vargas concede that plain error is the appropriate standard of review. Ferneau argues, however, that she properly preserved the issue. None of the defendants argued below that the Guidelines were unconstitutional.[4] Further, none of them objected based on Blakely or Apprendi v. New Jersey, 530 U.S. 466 (2000). Accordingly, our review is limited to determining whether the sentence constitutes plain error. See United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005)

---

[4]In Ferneau's case, she objected to what quantity was used in calculating her offense level. She did not object to the constitutionality of the application of the Guidelines as mandatory.

(en banc). To establish plain error, the defendants must show that (1) there was an error; (2) the error was plain; and (3) that the error affected substantial rights. Johnson v. United States, 520 U.S. 461, 466-67 (1997). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotations omitted). Further, the defendants have the burden of proving plain error. United States v. Olano, 507 U.S. 725, 734 (1993).

In Pirani, we held that a Booker/Blakely error "affects substantial rights" if there is a reasonable probability "that, but for the error the defendant would have received a more favorable sentence." Pirani, 406 F.3d at 552. Barth, Ferneau, and Vargas have not met their burden to show that there was a "reasonable probability" the district court would have imposed more favorable sentences if the Guidelines had been applied in an advisory manner.

Barth's sentence of life imprisonment plus five years was not determined based upon an application of the Guidelines, but rather the mandatory minimum sentences set forth in the statutes governing his conviction. Thus, Barth cannot prove that it would be possible for him to receive a more favorable sentence. Barth's argument that Blakely requires the facts of his past conviction to be submitted to the jury if they are used to enhance his sentence also fails. We have held that prior convictions do not have to be found by the jury. United States v. Scott, 413 F.3d 839, 840 (8th Cir. 2005); United States v. Patterson, 412 F.3d 1011, 1015 (8th Cir. 2005).

Vargas was sentenced at the bottom of the Guideline range. A sentence at the bottom of the Guideline range "is insufficient, without more, to demonstrate a reasonable probability that the court would have imposed a lesser sentence absent the Booker error." Pirani, 406 F.3d at 553. Further, the record suggests that the district court would not have imposed a lesser sentence. The district court stated that Vargas's sentence, while harsh, was "certainly appropriate and warranted."

Therefore, Vargas cannot demonstrate plain error. Finally, Ferneau was sentenced in the middle of the Guideline range. There is nothing in the record to suggest that the district court would have imposed a lesser sentence on Ferneau if the Guidelines were not mandatory. See, e.g., United States v. Clark, 409 F.3d 1039, 1045 (8th Cir. 2005) (concluding that there was no plain error where the defendant's 180 month sentence was within the range of 151 to 188 months).

Because the record, when taken as a whole, does not indicate that the district court would have imposed a more favorable sentence under an advisory sentencing regime in any of their cases, the defendants cannot establish the prejudice prong of the analysis. Accordingly, they fail to meet their burden to prove that the district court committed plain error in imposing the sentence enhancements.

For the foregoing reasons, we affirm the judgment of the district court in each appeal.

_____