# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-3205

_____

United States of America,                    *
                                             *
        Plaintiff - Appellee,        *
                                             *
v.                                           *
                                             *
Adolfo Martinez Ruiz,                        *
                                             *
        Defendant - Appellant.       *

_____                          Appeals from the United States
                                     District Court for the
No. 04-3248                          District of Minnesota.
_____

United States of America,                    *
                                             *
        Plaintiff - Appellee,        *
                                             *
v.                                           *
                                             *
Evencio Martinez Ruiz,                       *
also known as Juan Zabala,                   *
                                             *
        Defendant - Appellant.       *

No. 04-3251
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Steven Anthony Martinez, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted: May 11, 2005
Filed: July 5, 2005
_____

Before MORRIS SHEPPARD ARNOLD, MURPHY, and BENTON, Circuit Judges.
_____

MURPHY, Circuit Judge.

A jury convicted Adolfo Martinez Ruiz, Evencio Martinez Ruiz, and Steven Anthony Martinez of various counts relating to the distribution of drugs. The district court[1] sentenced Adolfo[2] to 121 months on two convictions, Evencio to 121 months on five convictions, and Steven to concurrent sentences of 120 months for convictions on two counts and 78 months on three counts. They appeal, claiming

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

[2]Because of similarity in family names, we refer to each appellant by his first name to avoid confusion.

Fourth Amendment violations, erroneous evidentiary rulings, insufficiency of the evidence, and misjoinder. We affirm.

I.

Minnesota Bureau of Criminal Apprehension (BCA) Agent Enrique Vasquez received a tip in November 2003 that Melvin Benitez was trying to sell drugs at a Gold'n Plump chicken processing plant near St. Cloud, Minnesota. Vasquez called Benitez to set up a purchase of methamphetamine. After several conversations they arranged that Vasquez would purchase three and a half pounds of methamphetamine for $31,500. The transaction was arranged for November 14 between 8:00 and 8:30 a.m. in the parking lot of a Kentucky Fried Chicken (KFC) in Waite Park. Benitez told Vasquez to set aside $3,500 of the purchase money because the proceeds were to be divided between himself and the owner of the drugs.

Vasquez called Benitez on the morning of November 14 and left a message around 7:35 a.m. Benitez called him back around 8:00 a.m., told him that he had just finished work and would be ready in about twenty minutes, and said that he would be driving either a pickup truck or a Honda with Washington plates.[3] Benitez called Vasquez again around 8:25 a.m. and asked him if he would do the deal at an apartment building. Vasquez heard voices speaking in Spanish in the background and refused to change the location of the meeting. Benitez agreed to meet at the KFC.

Benitez arrived at the KFC parking lot around 8:35 a.m. in a black pick up truck driven by Adolfo. Benitez went over to Vasquez's vehicle carrying a soft black cooler, and Vasquez asked him why he had brought someone else along. Benitez said his companion was the owner, which Vasquez understood to mean the owner of the

_____

[3]This was what Vasquez said about the description of the Honda at the suppression hearing; at trial he testified that Benitez had mentioned a black Honda.

methamphetamine, not the owner of the truck. When Vasquez asked Benitez if the driver was the main guy, he said no. Vasqeuz told Benitez that he wanted to see the drugs, and Benitez handed him the black cooler which contained about three and a half pounds of methamphetamine. Vasquez opened the cooler, saw methamphetamine inside, and gave an arrest signal. Benitez and Adolfo were then arrested.

BCA Agent Adam Castilleja interviewed Benitez in Spanish at the scene of the arrest. Benitez told him that Adolfo had picked up the methamphetamine from building 811 of the nearby Gatewood Apartment complex. Castilleja then spoke with Adolfo and told him that Benitez said the drugs were his. Adolfo said that was not true and that Benitez had obtained the black bag at building 901 of the Gatewood Apartments, the building next to the one Benitez had mentioned. Adolfo consented to a search of his trailer home in St. Cloud, and officers found a .40 caliber handgun in a drawer under the bed in a bedroom. They also found .38 caliber ammunition on the headboard of the bed. Adolfo admitted that the gun and ammunition were his.

While officers were searching the black pickup truck in the KFC parking lot, a cell phone on the seat began ringing with the number of the caller displayed. The number was traced to an apartment where Evencio and Steven lived, at 301 Birch Street in Rockville, apartment 101. Evencio and Steven rented the apartment under the names Juan Zabala and Antonio Orduna. Officers were dispatched to the Birch Street apartment building where they saw a black Honda with Washington plates and a red pickup truck in the parking lot; both were registered to Adolfo. They then observed Evencio make at least two trips from building 301 to building 305, where he remained for five to ten minutes each time. On the first trip, he stopped inside the Honda for about thirty seconds before walking over to building 305. Evencio and Steven left in the black Honda about five minutes after Evencio returned from his last trip.

Officers informed BCA Agent Billings that the men were leaving, and he instructed them to stop the car and identify the occupants because the Honda met the description of the other vehicle Benitez had told Vasquez about. Officers stopped the car, but they were unable to communicate with either Evencio or Steven because of language difficulties. Billings directed that they be detained until a Spanish speaking officer could arrive. Billings arrived at the scene about ten minutes later at about the same time as Agent Castilleja; already there were at least two other police vehicles, including a marked squad car. Evencio and Steven were standing in the road; they were not in handcuffs and no guns were drawn, but they had not been informed that they were free to leave. One of the officers handed Steven's wallet to Castilleja; another had Evencio's wallet, and the trunk of the Honda was open.

Castilleja spoke with Evencio in Spanish while the other officers were fifteen to twenty feet away. He gave him a Miranda warning, informed him that cooperation was voluntary, and asked if he would agree to a search of his apartment at 301 Birch Street. Evencio said he would but that Steven had the key. Castilleja then gave Steven a Miranda warning in Spanish, informed him that cooperation was voluntary, and asked for his permission to search the apartment. Steven agreed, and officers drove the men back to their apartment and used the key found in Steven's wallet to go inside.

After entering the apartment Castilleja read the two men a consent to search form in Spanish. They signed the form, which authorized a search of the apartment, a gray Honda, and the red truck. In the bottom of the kitchen garbage can officers found 36.1 grams of methamphetamine, 10.5 grams of cocaine, and two electronic scales. Elsewhere they found two bindles – small pieces of plastic knotted around a white powdery substance. One bindle was found between the cushions of the couch in the living room, and the other was found in a boot in Steven's room. Both bindles were placed into the same evidence bag.

Before any drugs were found in the apartment, Castilleja had asked Evencio about the other building he walked to earlier. Evencio said that he had been visiting his friend Reyna Barbosa and volunteered to take Castilleja to that apartment at 305 Birch Street, number 304. Barbosa agreed to a search of the apartment, and officers found a .38 caliber handgun wrapped in cloth inside a cardboard box in a bedroom closet. Officers found .38 ammunition and an identification card with Evencio's photograph and the name Juan Zabala in the box with the gun. The ammunition was made by the same manufacturer as that found in Adolfo's home.

As part of the investigation, officers went to the Gatewood Apartment complex and asked management if any residents spoke Spanish. The manager directed them to two different apartments, one of which was located in building 811. The officers spoke with the resident of that apartment and concluded that he had no connection to the transaction at the KFC. Pursuant to a separate investigation officers searched the same apartment in January 2004 and recovered a pound of methamphetamine.

A grand jury returned an indictment charging Adolfo, Benitez, Evencio, and Steven. All four were charged in counts 1 and 2: conspiring to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(a), and 846 (count 1), and aiding and abetting possession with intent to distribute approximately three and one half pounds of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (count 2). Evencio and Steven were indicted in counts 3-5: aiding and abetting possession with intent to distribute approximately 28 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (count 3); aiding and abetting possession with intent to distribute an amount of a mixture or substance containing a detectable amount of cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (count 4); and knowingly making a residence

available for the purpose of storing, distributing, and using a controlled substance, in violation of 21 U.S.C. § 856(a)(2).

Evencio and Steven moved to suppress the evidence found in their apartment, arguing that the search was a result of their illegal detention following the stop of the Honda. A magistrate judge issued a report and recommendation (R & R) recommending that their motions be denied. The magistrate found that their detention did not amount to a de facto arrest and that they gave consent to search the apartment. Steven objected to the R & R, but Evencio did not. The district court adopted the R & R and denied the motions. Benitez pled guilty, and the other defendants went to trial.

As part of its case in chief at trial, the government called a chemist as an expert witness. Over the defendants' objections, the chemist testified about his examination of the evidence bag containing the two bindles. He stated that when he received the evidence bag, both bindles were open and there was powder in the bag. The chemist tested 0.1 grams of the loose powder from the bag and found that it contained methamphetamine, dimethyl sulfon, and pseudoephedrine. He testified that he could not tell whether the sample he tested came from the bindle found in the couch or the bindle found in Steven's room.

The chemist also testified about the methamphetamine recovered at the KFC and found in the garbage can at the apartment. He stated that the methamphetamine from the KFC was separated into two distinct types of packaging. About half a pound was in a ziplock bag containing several smaller sandwich bags of methamphetamine with twelve percent purity, and a duct taped package contained about three pounds of methamphetamine with ten percent purity. The methamphetamine in both packages had been cut with dimethyl sulfon and contained pseudoephedrine resulting from an incomplete manufacturing process. The 36.1 grams of methamphetamine found in the garbage can at the apartment had ten percent purity, was cut with

dimethyl sulfon, and contained pseudoephedrine. The chemist testified that methamphetamine can range in purity from one percent to a hundred percent and that there were many different cutting agents. Over defense objections, the government asked the chemist if the cutting agent, the purity, and the presence of pseudoephedrine in the packets of methamphetamine recovered at the KFC and the packet found in the garbage at the apartment were consistent. The chemist responded that it was possible that the three samples all "originated from the same process or cooking of methamphetamine."

On cross examination, the chemist admitted that there frequently is some ephedrine or pseudoephedrine left over at the end of the methamphetamine manufacturing process. He also said that he did not know what the average purity of methamphetamine was and agreed that dimethyl sulfon was the most common cutting agent used in methamphetamine manufacturing.

BCA Special Agent Boulger also testified as an expert for the prosecution, based on his thirty four years of experience investigating narcotics. He testified that 1 gram of methamphetamine or cocaine would contain about ten to fifteen individual doses and that he would not consider 36 grams of methamphetamine to be a personal use quantity. He stated that the purity of methamphetamine varies widely and that there is no common purity. He also testified that stash houses are generally obtained by using a false name and identification or by having someone else actually rent the property. He stated that cell phones are tools of the drug trade and that conspirators are likely to maintain communication with each other.

Agent Castilleja testified about his interview of Adolfo after the arrest at the KFC. According to Castilleja, Adolfo told him that Benitez had approached him at work and offered to pay him $500 for a ride to the KFC to deliver methamphetamine. Adolfo's testimony at trial, however, was that Benitez had asked him for a ride to St. Cloud the morning of November 14 because he had lent his car to a friend. He said

that Benitez directed him to the Gatewood Apartments where he was supposed to pick up his car. Benitez went inside the apartments with the black cooler and was there for about five minutes. When he came back, he was carrying the cooler and told Adolfo that his car was not there. He asked Adolfo to drop him off at the KFC and to wait while he asked Vasquez for a ride. Adolfo denied telling Castilleja that he knew there was methamphetamine in the cooler or that Benitez offered to pay him $500 to drive him to the KFC.

Steven also took the stand. He testified that he had no idea what methamphetamine was, that he had never used methamphetamine, and that he had never seen Evencio use methamphetamine. He said that he had never seen the bindles, the cocaine, the methamphetamine, or the scales found in the search of his apartment. He also testified that although his real name was Saul Quinonez Perez, he used the name Steven Martinez in order to obtain work at Gold'n Plump. He said that he used the name Antonio Orduna to rent the Birch Street apartment because he had previously tried to rent an apartment under the name Steven Martinez but had been denied due to bad credit. He also said that he and Evencio were the only two individuals with keys to the apartment.

Adolfo, Evencio, and Steven appeal. Adolfo argues that the district court erred by allowing into evidence the .40 caliber handgun found in his trailer and the .38 caliber handgun found in Barbosa's apartment. Evencio argues that the evidence was insufficient to support his convictions on counts 1 and 2 and that his detention at the scene of the stop became an arrest without probable cause and made his subsequent consent to search his apartment involuntary. Steven argues that the evidence was insufficient to support his convictions on all five counts, that his consent to search the apartment was obtained through coercion following an illegal arrest, that the chemist's testimony regarding the source of the methamphetamine was inadmissible, that the district court erred by allowing introduction of the bindles and the chemist's

testimony about their contents, and that counts 1 and 2 were improperly joined with counts 3, 4, and 5.

## II.

Evencio and Steven argue that their Fourth Amendment rights were violated by the stop of their Honda and their illegal arrests. They contend that the stop went beyond the permissible scope and duration of an investigatory stop and they were arrested without probable cause. After the officers stopped their vehicle, no one informed them they were free to leave, there were numerous police officers and drug agents and vehicles at the scene, officers did not return the men's wallets or car keys, they searched the Honda without first obtaining consent, and then transported the men back to the apartment. Evencio and Steven argue that their illegal detention and the coercive circumstances surrounding the stop rendered their consent to search involuntary.

The government contends that the scope of the investigatory stop did not exceed permissible bounds because it was reasonable for officers to detain Evencio and Steven for a brief time until a Spanish speaking officer arrived at the scene. See United States v. Sharpe, 470 U.S. 675, 685-86 (1985) (courts should consider the law enforcement purposes to be served by the stop, as well as the time reasonably needed to effectuate those purposes). The government contends that there was no undue delay because Agent Castilleja arrived about ten minutes after the stop, citing United States v. Bloomfield, 40 F.3d 910, 916-17 (8th Cir. 1994) (en banc) (sixty minute delay for canine unit was not unreasonable), and that the atmosphere at the scene was calm and there were no indications that the men were under arrest. It alternatively argues that even if the detention exceeded the scope of an investigatory stop, Evencio and Steven consented to the search.

We review the district court's factual findings of consent for clear error and review de novo the denial of the motions to suppress. United States v. Morreno, 373 F.3d 905, 910 (8th Cir. 2004). We review de novo whether a detention amounted to an arrest. Bloomfield, 40 F.3d at 916. Since Evencio did not object to the magistrate's recommendation that his motion to suppress the evidence found in his apartment be denied, we review the factual findings underlying his claim for plain error rather than clear error. United States v. Lonnie Horse Looking, 156 F.3d 803, 809 (8th Cir. 1998).

Evencio and Steven concede that the officers had a reasonable suspicion to stop the Honda, but we are called on to determine whether their continued detention was reasonable. On this issue we consider the duration of the detention and whether the officers tried to conduct their investigation quickly and unintrusively, Bloomfield, 40 F.3d at 916, and we keep in mind that an "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). Time is an important factor in distinguishing between an investigative stop and a de facto arrest, and other significant factors include whether there were unnecessary delays and whether the suspects were handcuffed or confined in a police car. Bloomfield, 40 F.3d at 917.

Since the officers at the scene could not communicate with Evencio and Steven, Agent Castilleja was called to the scene because he speaks Spanish. Castilleja arrived within ten minutes of the initial stop, see Sharpe, 470 U.S. at 686-88 (twenty minute detention was reasonable when the police acted diligently and defendant contributed to the delay). When he arrived, Evencio and Steven were standing by the side of the road and neither was in handcuffs. Castilleja advised them of their Miranda rights and informed them that they did not have to speak with him. We note that Castilleja arrived quickly and that the circumstances of the stop do not support the conclusion that it turned into a de facto arrest. We conclude that the investigative stop was reasonable in duration and scope.

We examine the totality of the circumstances in determining whether consent was given voluntarily, including the nature of the encounter and the characteristics of the consenting party. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990). After Castilleja explained that cooperation was voluntary, Evencio and Steven agreed to a search of the apartment. They were not under arrest, Castilleja read through a Spanish consent form with them, and they signed the form. Moreover, Evencio cooperated with officers by leading them to Barbosa's apartment in building 305. See United States v. Alcantar, 271 F.3d 731, 738 (8th Cir. 2001) (failing to object to the continuation of a consent search makes the continued search objectively reasonable). We conclude that Evencio and Steven voluntarily consented to the search of the apartment and that the district court did not err in denying the motions to suppress.

III.

Adolfo and Steven raise issues in respect to the evidentiary rulings at trial. We review the district court's rulings on the admissibility of evidence for abuse of discretion. United States v. Salcedo, 360 F.3d 807, 809 (8th Cir. 2004).

A.

Adolfo argues that the court erred in allowing the government to introduce into evidence the .40 caliber handgun found in a drawer under his bed and the .38 caliber handgun found in the closet in the apartment in Rockville. He claims that this evidence was irrelevant under Federal Rule of Evidence 401 because there was no evidence showing that either gun had a connection to drug activity or that Adolfo was connected to the gun found in the apartment. He points out that officers found no drugs in either location where the guns were found, that there was no ammunition for the .40 caliber gun, that the guns were found many miles from the site of the sale, and that the guns were stored so that they were not readily usable.

-12-

Adolfo also contends that the evidence should have been excluded under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice, and that its admission denied him a fair trial and due process of law. In particular, he argues that the gun evidence was prejudicial to his credibility because his trial testimony conflicted with Castilleja's testimony. Adolfo contends that prejudice to a defendant's credibility requires reversal where credibility can be decisive, citing United States v. Blue Bird, 372 F.3d 989, 994 (8th Cir. 2004). He also says that the gun could have caused the jury to reach its verdict on an improper basis because it had no connection to the drug transaction and made Adolfo appear dangerous. See United States v. Dierling, 131 F.3d 722, 730 (8th Cir. 1997).

The government argues that the district court did not abuse its discretion by admitting the evidence. It contends that the evidence was highly relevant because firearms are known tools of the drug trade, citing United States v. Claxton, 276 F.3d 420, 422-23 (8th Cir. 2002), and United States v. Simon, 767 F.2d 524, 527 (8th Cir. 1985). It points out that the ammunition found in Adolfo's trailer matched the ammunition and the caliber of the gun found in Barbosa's apartment together with Evencio's false identification. The evidence thus links both brothers with tools of the drug trade.

Evidence is relevant under Rule 401 if it makes "the existence of any fact that is of consequence to the determination of the action" more or less probable. As the government points out, there is a close and well known connection between firearms and drugs. Claxton, 276 F.3d at 423. Firearms are tools of the drug trade due to the dangers inherent in that line of work. Id.; Simon, 767 F.2d at 527. The ammunition found in Adolfo's trailer connects him to the .38 caliber gun and the matching ammunition found in Barbosa's apartment with Evencio's identification. Moreover, the morning of the drug transaction Evencio made at least two trips to Barbosa's apartment after Adolfo's cell phone showed a call originating from Evencio's apartment. The proximity of the .38 caliber gun to the drugs found in Evencio's

-13-

apartment and the matching ammunition found in Adolfo's trailer establishes a link between Adolfo and Evencio that is related to the drug trade, and the gun evidence was relevant proof that Adolfo was involved in a conspiracy to distribute methamphetamine.

Under Rule 403 relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Simply because evidence is prejudicial does not mean that it must be excluded, United States v. Noland, 960 F.2d 1384, 1387 (8th Cir. 1992), and great deference is given the district court's balancing of the probative value and prejudicial impact of the evidence. Claxton, 276 F.3d at 422-23. In this case the evidence was relevant to prove Adolfo's involvement in the conspiracy to distribute methamphetamine. Moreover, the gun evidence did not unfairly prejudice Adolfo's credibility because it did not directly contradict his trial testimony in which he said he had not admitted his involvement to Agent Castilleja. The jury was able to make its own credibility determinations based on the trial testimony of both Adolfo and Castilleja. We conclude that the district court did not abuse its discretion in admitting this evidence.

B.

Steven argues that the district court abused its discretion by allowing the chemist to testify that the methamphetamine found in the garbage can at the apartment and the two packets recovered at the KFC could have "originated from the same process or cooking of methamphetamine" based on a comparison of their purity, common cutting agent, and the presence of pseudoephedrine. He contends that this testimony was speculative and rested on unsupported assumptions, citing United States v. Arenal, 768 F.2d 263, 270 (8th Cir. 1985) (abuse of discretion to allow police officer to testify that the presence of only one cutting agent in cocaine signified a common source).

The government points out that the testimony in this case came from a chemist rather than a police officer as in <u>Arenal</u> and that the chemist did not testify that the methamphetamine came from the same source. Instead, he only stated that the common chemical composition was consistent with both sets of drugs having come from the same manufacturing process, a fact not necessarily evident to those without expertise in chemistry. The government also asserts that this type of testimony has been found proper by this court, citing <u>United States v. Hughes</u>, 15 F.3d 798, 800-01 (8th Cir. 1994).

Rule 702 permits a qualified expert to testify in the form of an opinion if his specialized knowledge would assist the jury in understanding the evidence or in deciding a fact in issue. The chemist in this case testified that the purity of methamphetamine can range from one percent to a hundred percent, and this testimony was corroborated by Agent Boulger's testimony that the purity of methamphetamine varies quite extensively. The chemist's testimony here was very different from the officer's testimony in <u>Arenal</u> which was based on the presence of a sole cutting agent. In this case the chemist testified about the degrees of purity and the presence of pseudoephedrine, in addition to the cutting agent used, and he did not conclude that the methamphetamine came from the same source but that it was possible it originated from the same manufacturing process.

This case is similar to <u>Hughes</u>, in which a chemist testified that two samples of crack had the same purity level and that this was a significant factor in determining whether they came from the same batch. She further stated that in her experience it was unusual to find two batches of crack with the same purity level. 15 F.3d at 801. We distinguished her expert testimony from that in <u>Arenal</u>, because she had not testified that the samples of crack came from the same batch and the jury was allowed to draw its own conclusions based on the expert testimony. <u>Id</u>. We have the same contrast in this case. We conclude that the district court did not abuse its discretion in allowing the chemist's testimony.

C.

Steven also argues that the district court erred by admitting into evidence the exhibit containing the two bindles and by allowing the chemist to testify about their contents. He claims that this exhibit was other crimes evidence that should have been subjected to Rule 404(b) scrutiny because the amount of powder in the bindles was consistent with personal use and no defendant was charged with simple possession of methamphetamine. He contends that the evidence was irrelevant and prejudicial because the chemist could not conclusively state that the bindle found in his room contained methamphetamine. See United States v. Runge, 593 F.2d 66, 70 (8th Cir. 1979) (evidence not linked to defendant "irrelevant, somewhat confusing, and prejudicial").

The district court admitted this evidence as res gestae but stated its willingness to give the jury a Rule 404(b) instruction. Steven's counsel rejected the offer, on the grounds that the evidence was not being offered under 404(b), and objected to the exhibit as more prejudicial than probative. Even though the chemist could not state whether the powder he tested came from the bindle found in Steven's room because both bindles had been placed in the same evidence bag, the exhibit was relevant because the sample taken from the bag tested positive for methamphetamine. Both bindles were found in Steven's apartment, one in his bedroom and one in the living room couch, and the evidence was properly admitted under the res gestae theory because it tended to prove that Steven knew about the drugs found in the apartment. See United States v. Roberts, 253 F.3d 1131, 1133-35 (8th Cir. 2001); United States v. Riebold, 135 F.3d 1226, 1229 (8th Cir. 1998). Moreover, Steven declined the court's offer to give a Rule 404(b) instruction to the jury. He has not shown that the district court erred or abused its discretion in respect to this evidence.

IV.

Both Evencio and Steven raise claims of insufficiency of evidence. In considering the sufficiency of the evidence underlying a jury verdict, the scope of our review is quite limited. A conviction will be reversed on insufficiency grounds only if, "after viewing the evidence in the light most favorable to the jury's verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence, no construction of the evidence will support the jury's verdict." United States v. Hollingsworth, 257 F.3d 871, 878 (8th Cir. 2001). The verdict will be upheld if the government produced sufficient evidence for a reasonable jury to find the elements of the offense beyond a reasonable doubt. United States v. Hamilton, 332 F.3d 1144, 1148-49 (8th Cir. 2003).

A.

Evencio contends that the evidence was insufficient to support his convictions on count 1, conspiracy to distribute 500 grams or more of methamphetamine, and count 2, aiding and abetting possession with the intent to distribute approximately three and a half pounds of methamphetamine (both relating to the undercover buy at the KFC). He argues that the government did not show a connection between Steven and him on the one hand and Adolfo and Benitez on the other. He cites United States v. Holt, 427 F.2d 1114, 1117 (8th Cir. 1970), for the proposition that merely associating with others does not prove a conspiratorial agreement. He further points out that he was not present at the scene of the buy, the evidence did not establish who called Adolfo's cell phone or the purpose of that call, both Adolfo and Benitez separately indicated that the drugs were obtained at the Gatewood Apartment complex, he did not appear nervous or rushed when he made trips between his building and Barbosa's apartment, and Benitez's comments about the division of proceeds were consistent with the involvement of only two people.

The government responds that the evidence at trial proved beyond a reasonable doubt that Evencio participated in a drug conspiracy which operated from his apartment and which delivered three and a half pounds of methamphetamine at the KFC on November 14. The government contends that Evencio failed to acknowledge the common sense conclusions that flow from the evidence in the case.

Officers found distribution quantities of methamphetamine and cocaine and scales in the garbage in Evencio's apartment. The methamphetamine found in the garbage had ten percent purity, was cut with dimethyl sulfon, and contained pseudoephedrine, as did approximately three pounds of the methamphetamine recovered at the KFC. The chemist testified that these matching characteristics were consistent with the drugs originating from a common manufacturing process. Evencio and Steven rented their apartment under false names, and Agent Boulger testified that stash houses are commonly leased in that way. Agent Vasquez heard voices speaking Spanish in the background when Benitez called him the morning of the transaction and tried to change the meeting place to an apartment: When Vasquez refused, Benitez arrived about ten minutes later, the time it takes to drive from Evencio's apartment to the KFC according to the testimony of one officer.[4]

Shortly after the transaction would have been expected to be finished, there was a telephone call from Evencio's apartment to the cell phone in Adolfo's truck, and Agent Boulger testified that conspirators commonly keep in touch as a safety measure and cell phones are tools of the drug trade. When officers arrived at Evencio's apartment to conduct surveillance, they saw him going back and forth between buildings 301 and 305, and they later found a gun and ammunition with Evencio's false identification in Barbosa's apartment in building 305. The ammunition matched that found at Adolfo's home. Officers also saw Evencio and Steven leave their

_____

[4]Investigator Greenwald testified at trial that he had driven from the KFC to the apartment at 301 Birch Street and that the trip took ten minutes or less. Investigator Wochnick estimated that the trip would take fifteen to twenty minutes.

-18-

apartment in a Honda with Washington plates that matched the description given by Benitez of one of the vehicles that might be expected at the KFC. Taking the evidence in the light most favorable to the government, there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Evencio was guilty of both conspiring and aiding and abetting.

B.

Steven argues that the evidence was insufficient to show that he knowingly participated in any of the five crimes with which he was charged. Regarding count 1, conspiracy to distribute methamphetamine, and count 2, aiding and abetting possession with intent to distribute approximately three and a half pounds of methamphetamine, Steven contends that the government failed to produce any evidence linking him to the deal at the KFC and points out that he was nowhere near the deal and was not seen associating with anyone who participated in the deal. He cites United States v. Cruz, 285 F.3d 692, 710 (8th Cir. 2002), for the proposition that association with a known drug dealer and mere presence at the location of a crime are not sufficient to establish guilt on a conspiracy charge. He contends that the evidence of his involvement in the conspiracy is less than found legally insufficient in Cruz. He also points out that both Benitez and Adolfo told police immediately after their arrests that the methamphetamine had come from the Gatewood Apartments and that an independent investigation later uncovered methamphetamine in the building identified by Benitez.

Steven argues that there is no evidence that he had knowledge of the drugs found in his apartment and that the evidence was thus insufficient to support his convictions on count 3, aiding and abetting possession with intent to distribute approximately 28 grams of methamphetamine, count 4, aiding and abetting possession with intent to distribute cocaine, and count 5, knowingly making a residence available for the purpose of storing, distributing, and using a controlled

substance. He had been roommates with Evencio for only about a month and a half at the time of their arrests he argues, and there were no obvious signs of drug dealing or drug possession in the apartment. Since the drugs found there were well hidden and not likely to have been seen by him he says, they do not support an inference of his knowledge, citing United States v. Thorne, 997 F.2d 1504, 1510 (D.C. Cir. 1993) (drugs hidden in closet of shared bedroom insufficient to prove constructive possession). Steven contends that this case is similar to United States v. Bonham, 477 F.2d 1137 (3d Cir. 1973), where residence in a shared bedroom in which heroin was found hidden in a niche above the doorway was insufficient to prove possession. The only possible link between him and any drugs he says was the plastic bindle found in his bedroom. Since the chemist could not tell whether the powder he tested came from that bindle, Steven contends that the jury would have had to make an impermissible inference to find that it contained methamphetamine.

The government responds there was overwhelming evidence that Steven's apartment was being used as a stash house and was the source of the three and a half pounds of methamphetamine delivered at the KFC. It points out that Steven was found with the only key to the apartment in which the hidden drugs and scales were found and that one of the bindles was found in a boot in his room. The government argues that Steven's knowledge can be inferred from the surrounding circumstances, citing United States v. Ojeda, 23 F.3d 1473, 1476 (8th Cir. 1994). It also contends that the jury could properly draw an inference of Steven's guilt from its disbelief of his trial testimony denying any knowledge of methamphetamine. United States v. Reed, 297 F.3d 787, 789 (8th Cir. 1995).

Much of the evidence supporting Evencio's convictions also supports Steven's. The judge instructed the jury that merely being present at the scene of the crime or associating with others does not prove that a person has joined a conspiracy or aided and abetted the commission of a crime. See Cruz, 285 F.3d at 701. Here there was significantly more evidence to link Steven to the offenses than there was in Cruz, the

case he cites. The apartment in which distribution amounts of methamphetamine and cocaine were found was leased by Steven and Evencio under false names, and the only key found was in Steven's possession. Shortly after the KFC deal was to have been completed, a telephone call had been placed from the apartment to the cell phone found in Adolfo's truck. Police saw Steven and Evencio leave the apartment soon after this call in a vehicle matching a description given ahead of time by Benitez. A bindle containing white powder was found in a boot in Steven's bedroom, and a chemist testified that a sample of powder he tested from the evidence bag holding the two bindles contained methamphetamine. Given all the evidence it would not have been mere speculation for the jury to make the reasonable inference that the bindle found in Steven's room contained methamphetamine. Steven denies any knowledge of the drugs found in his apartment, but the jury could reasonably infer his knowledge from the circumstances. See Ojeda, 23 F.3d at 1476 (defendant's knowledge generally established through circumstantial evidence).

Steven testified at trial that he did not know what methamphetamine was, that he had never used methamphetamine, and that he had never seen Evencio use methamphetamine. He also said that he had never seen the bindles, the cocaine, the methamphetamine, or the scales found in the apartment. The jury had the opportunity to weigh the credibility of Steven's testimony at trial, and its verdict suggests it must have found him not credible. When there is other corroborative evidence, "the jury can properly draw an inference of guilt from its disbelief of the defendant's denials." United States v. Reed, 297 F.3d 787, 789 (8th Cir. 2002); see also United States v. Vazquez, 53 F.3d 1216, 1225 (11th Cir. 1995) (jury may view defendant's false explanatory statement as substantive evidence of guilt, particularly if the government must prove highly subjective elements such as intent or knowledge). We conclude that a reasonable jury could have found beyond a reasonable doubt that Steven had knowledge of and involvement in the KFC transaction and that he knew about the drugs in his apartment.

V.

Steven argues that the joinder of counts 1 and 2 relating to the transaction at the KFC with counts 3, 4, and 5 was improper because the indictment did not sufficiently allege that the counts were factually interrelated. See United States v. Darden, 70 F.3d 1507, 1526-27 (8th Cir. 1995). He also claims that joinder was prejudicial because the evidence from counts 1 and 2 would not have come in with respect to counts 3, 4, and 5, and vice versa. The district court erred in denying his motion for severance he argues.

When a defendant moves for severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. Even if joinder is proper under that rule, the court still has discretion to sever under Rule 14. We review whether joinder was proper de novo, United States v. Moyer, 313 F.3d 1082, 1085 (8th Cir. 2002), and will reverse only upon a showing of an abuse of discretion which resulted in "severe or compelling prejudice." United States v. McGuire, 45 F.3d 1177, 1187 (8th Cir. 1995). The rules are to be liberally construed in favor of joinder. Darden, 70 F.3d at 1526.

Rule 8(a) allows joinder of counts if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Steven was charged in count 3 with aiding and abetting possession with intent to distribute approximately 28 grams of methamphetamine, and Agent Boulger's testimony indicated that 28 grams is a distribution amount of methamphetamine. Count 1 charged conspiracy to distribute 500 grams or more of methamphetamine, and possession of a distribution amount of the drug during the time of the charged conspiracy is evidence of conspiracy to distribute methamphetamine. See United States v. Escobar, 50 F.3d 1414, 1420 (8th Cir. 1995). Significantly, the methamphetamine recovered in the garbage can at Steven's apartment matched approximately three pounds of the methamphetamine

-22-

involved in the transaction at the KFC in terms of purity, cutting agent, and the presence of pseudoephedrine. This match showed a connection between count 3 and counts 1 and 2. Steven was charged with possession with intent to distribute cocaine in count 4 and making a residence available for the purpose of storing, distributing, and using a controlled substance in count 5, and the facts underlying these counts are related to those in counts 1 and 2. All the crimes charged are offenses of the same or similar character. See United States v. Boyd, 180 F.3d 967, 981 (8th Cir. 1999) (offenses are of the same or similar character if they refer to the same type of offenses occurring over a relatively short period of time and have overlapping evidence). Joinder of the offenses was thus proper under Rule 8(a). The indictment sufficiently alleged that the joined counts were factually interrelated, and joinder was proper under Rule 8 in this case.

The presumption against severing properly joined cases is strong, United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996), and the district court did not abuse its discretion by denying Steven's motion. The district court instructed the jury that "each alleged offense and any evidence pertaining to it should be considered separately" and that it "must give separate and individual consideration to each charge against each defendant." Moreover, there was evidence such as the methamphetamine found in the garbage can at the apartment that was relevant on both sets of charges, and the possibility that a defendant's chances for acquittal may be better in separate trials is an insufficient justification for severance. Delpit, 94 F.3d at 1040.

VI.

After studying the record, we find no reversible error. Neither the stop of the Honda nor the search of the apartment violated Evencio's and Steven's Fourth Amendment rights. The district court did not abuse its discretion by admitting evidence of the guns, by allowing the chemist to testify that the methamphetamine

could have originated from the same manufacturing process, or by admitting the exhibit containing the two bindles and allowing the chemist to testify about its contents. The evidence was sufficient to support Evencio's and Steven's convictions, and joinder of the counts was proper and the district court did not abuse its discretion in denying the motion to sever. We accordingly affirm the judgments of the district court.

_____