Filed 7/21/16  P. v. Davis CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B259412 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA397308) |
| v. | |
| DEONDRE DAVIS et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Katherine Mader, Judge.  Affirmed.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Deondre Davis.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Donald Blacksher.

Kamala D. Harris, Attorney General, Gerald A. Engler and Lance E. Winters, Assistant Attorneys General, Paul M. Roadarmel, Jr. and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Deondre Davis and Donald Blacksher appeal from judgments entered upon their jury convictions of first-degree murder, with gang and firearm allegations.

Blacksher challenges the denial of his *Batson*/*Wheeler*[1] motion, the exclusion of expert testimony on eyewitness identification, the limit imposed on witness cross-examination, the jury instructions on murder, and the 25-year firearm enhancement. He also alleges cumulative error. Davis challenges the jury instruction on felony murder and the firearm enhancement.[2] We find no error requiring reversal and affirm the judgments.

## FACTUAL AND PROCEDURAL SUMMARY

On the evening of April 27 and into the early morning hours of April 28, 2012, Jamon Winston and the victim, Michael Davis,[3] were at the Palms Motel, on South Figueroa Street in Los Angeles. They were in room 8, on the second floor of the motel. Two underage girls, Kayonna S. and Shanice B., were with them.

At some point Kayonna heard people outside the room, pulled the drape covering the window, and saw appellant Davis. Davis was a Five Deuce Hoover Crips gang member, also known as "Tiny Bosco." Shanice, who knew Davis,[4] also looked out of the window. Davis called her a "Nap ass bitch" and told her to go outside to fight a woman standing next to him. Shanice refused to leave the room. After the victim peeked out of the window as well, Davis commented that there were "Nap niggas" and "sissies" in the room. "Nap" is a derogatory term for the Neighborhood Crips gang, a rival of the Hoover gang, while "sissies" specifically disrespects the Rolling 60's, a subset of the

---

[1] *Batson v. Kentucky* (1985) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[2] Appellants join in each other's arguments.

[3] Coincidentally, Michael Davis and appellant Davis have the same last name. To avoid confusion, we refer to appellant by his last name, and we refer to Michael Davis as "the victim."

[4] Shanice gave varying accounts about how she knew Davis, at times admitting they had been in a sexual relationship. Davis claimed Shanice, who at the time of the shooting was seven months pregnant, was his "baby mama." He also made statements suggesting the motel was a place of prostitution, and Shanice was "a hoe for him," and owed him money.

Neighborhood Crips gang. The victim was a member of the East Coast Crips gang, which also was an enemy of the Hoover gang.

Throughout the evening, Davis called and texted Shanice, repeatedly telling her to open the door and go outside. One of the texts read: "On HXXVA [i.e. "Hoover"] I got my pistol [a]nd every room is sold up with home girls and homies." A large group congregated next door in room 7. Ronica Melchor, a 107 Hoover Criminals gang member, was in that room. Davis, whom she was dating at the time, was in and out of the room all night. A number of other people were there as well, drinking, smoking, and snorting cocaine. Appellant Blacksher, an 11 Deuce Hoover Criminals gang member known as "CK," was among them.

There was constant knocking on the window of room 8, as well as kicking and knocking on the door. At one point, the victim yelled, "Fuck Snoovers," and Davis responded, "You going to bust some Hoovers?" The victim also said, "On East Coast. I get this shit shut down. " Davis responded, "I hear you nap ass nigga. . . . [¶] These walls are thin."
The men in room 8 grew progressively nervous and tried to call for help, but were unable to reach anyone. They attempted to climb out through the bathroom window. The victim called 911 and told the operator there were six black males outside the room, knocking on the door and window and trying to get in to beat him up. When the operator called back, the victim denied making the call.

Around 1:30 a.m., it became quiet, and the men dozed off on the bed. About half an hour later, Davis kicked in the door and began hitting the victim, asking, "Groove, where you from?" "Groove" is a greeting used by the Hoover gang. The victim responded he did not "bang." Winston ran into the bathroom and again tried to escape through the window. He blocked the bathroom door and waited a few minutes, then left the motel unharmed.

Melchor saw about five people leave room 7 when Davis went over and kicked in the door to room 8. When Melchor got to room 8, she saw two girls leave. Appellants and the victim were the only ones in the room. As Davis turned around to get off of the

3

victim, Melchor saw Blacksher fire a shot from the foot of the bed. Afterwards, Melchor and Davis went to the home of one of Davis's friends. The next day, Blacksher called Davis, and Melchor overheard him ask, "[W]hat is nigga saying about what happened[?]"

When Davis kicked in the door, Kayonna ran out of the room, followed by Shanice. Kayonna heard someone say, "Where them bitches went?" She heard a gunshot when she was halfway down the stairs. Shanice did not see a weapon in Davis's hands and did not know if and where the victim had been shot because she was running through the door of room 8 when she heard the shot. A woman standing at the door tried to block her in, but Shanice pushed back.

Both girls called 911 to report the shooting. In her call, Kayonna initially said that "this black guy got in my room where he shot—he shot our friend." Later in the call, she said that the "niggers had kicked the door down. And he came in there and started beating up on one of the niggers that was our friend. And then he pulled out—" She thought two people were hurt, and described the person with the weapon as light-skinned, with long hair, tall, and wearing a white tank top.

Shanice reported that "they just shot my friend in the face and . . . now they following us." She initially said that "the boys—the guy that . . . ran up in the room and he beat up our friend, and then they shot him in the face. . . . [¶] I know who they are because I used to kick it with them a long time ago." Later on in the call, she said: "The nigger bust down the door. He came in and started . . . beating up the boy we talk to. [¶] And then he ran up and pulled the gun out and he shot him in the face and he shot the other boy. He tried to shoot us but we ran out the door and he missed us. And now he running after us." At trial, Shanice testified she initially assumed Davis was the shooter because he was the one hitting the victim, and she also assumed he had killed both men in room 8.

In her interview with police after the shooting, Shanice selected Davis out of a six pack as the person who kicked down the door and started beating the victim. On May 8, 2012, she selected Blacksher from a six pack as the person who walked in after Davis and

4

stood at the foot of the bed. She claimed to remember him because he had "bubble eyes." Shanice picked Melchor as the woman who tried to block her exit.

The victim died of a single gunshot wound. The bullet entered through his face and punctured his lung. This indicated that the shot had not been fired at close range. The victim also had an abrasion on his forehead.

Blacksher's DNA was found on a cup in room 7. Fingerprints matching those of Melchor and Davis were found on cups and a soda bottle in the same room. Shanice, Kayonna, Winston, Davis, and Melchor were caught on surveillance video leaving the motel after the shooting, but Blacksher was not identified among the individuals on the video.

When interviewed by police, Davis admitted assaulting the victim, but denied breaking down the door or being present when the victim was shot. During a later recorded conversation with a confidential informant, Davis said he heard a pop while he was beating the victim and affirmed the informant's statement that "[t]he nigger popped the nigger while you were on top of him."

After the shooting, Blacksher sent out a text message, asking the recipient to pray for him because he had sinned. He later reported his phone stolen, had its number cancelled, and attempted to have all information stored on it deleted. Metro PCS records showed the phone connected to a tower in the general vicinity of the motel on the night of the shooting. Although at the time Blacksher resided at a transitional center in Tarzana, the center's log showed he had not been on the premises between April 27 and April 29, 2012. After he was arrested, Blacksher called the program monitor and another individual to set up an alibi for April 27 and 28. Blacksher refused to provide a DNA sample and defied an order in open court to do so. Melchor received a letter from Davis letting her know that Blacksher knew where Melchor's family lived. At trial, Blacksher repeatedly warned Melchor not to testify.

Appellants were charged with murder, with gang and firearm enhancement allegations.[5] (Pen. Code, §§ 187, subd. (a); 186.22, subd. (b)(1)(C); 12022.53, subds. (b)-(e).)[6] A prior strike conviction, a serious felony prior conviction, and a prison prior conviction were alleged as to Davis; the allegations for Blacksher were similar, except that two prison priors were alleged as to him. (§§ 667.5; 667, subds. (a)(1), (b)-(i); 1170.12, subds. (a)-(d).) The jury found appellants guilty of first-degree murder and found the gang allegations to be true. While the jury found true the allegations of firearm use by a principal, it found not true the allegations that either appellant personally used a firearm.

Appellants admitted their priors. Davis was sentenced to 25 years to life, doubled to 50 years, plus 25 years to life on the firearm enhancement and a five-year term under section 667, subdivision (a)(1), for a total of 80 years. Blacksher received the same sentence, plus an additional one-year term under section 667.5, subdivision (b), for a total of 81 years. Appellants were awarded 889 and 885 days in custody respectively. They were ordered to pay victim restitution and were assessed various fines and fees.

This appeal followed.

## DISCUSSION

### I

Blacksher argues the court erred in denying his *Batson*/*Wheeler* motion based on the prosecutor's peremptory challenges of Prospective Jurors Nos. 3243 and 1588, each of whom was African-American. We find no error.

Racially discriminatory peremptory challenges violate both the federal and state Constitutions. (*People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*), citing *Batson*, *supra*, 476 U.S. at p. 97; *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.) In ruling on a

---

[5] Melchor also was charged. She pled guilty as accessory after the fact and admitted a gang enhancement allegation. She testified for the prosecution on a grant of immunity.

[6] Undesignated statutory references are to the Penal Code.

6

*Batson*/*Wheeler* challenge, the court must first determine "whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination." (*Lenix*, at pp. 612–613.) Because the trial court found a prima facie showing had been made, only the second and third step in the analysis are at issue here.

A. *Race-Neutral Reasons*

At step two of a *Batson*/*Wheeler* challenge, the prosecutor must offer legitimate reasons for making the challenges, but the reasons need not support a challenge for cause and may be trivial and idiosyncratic, so long as they are "'"genuine and neutral"'" and not inherently discriminatory. (*Lenix*, *supra*, 44 Cal.4th at p. 613; see also *Rice v. Collins* (2006) 546 U.S. 333, 338.)

Blacksher argues that some of the prosecutor's reasons for challenging Prospective Jurors Nos. 3243 and 1588 were not race neutral. The prosecutor reasoned that Juror No. 3243, a woman, had "extraordinarily long pink fingernails" and braided hair, which struck the prosecutor "as being fairly liberal." Juror No. 1588, a man, was similarly challenged for appearing to be "very liberal" because he, too, wore his hair braided and had ear phones. Blacksher provides no evidence or authority in support of the argument that long painted fingernails and braided hair predominate among African-Americans and should be considered race attributes. Generally, characteristics of a juror's appearance based on grooming are race neutral because they reflect personal preferences not peculiar to any race. (See e.g. *Purkett v. Elem* (1995) 514 U.S. 765, 768–769 [prosecution's reason for striking juror based on his long unkempt hair, mustache and beard was race neutral]; *U.S. v. Meza-Gonzalez* (8th Cir. 2005) 394 F.3d 587, 593–594 [declining to find "long brightly colored fingernails" to be "a racial indicator"]; *People v. Wheeler* (N.Y. App. Div. 2015) 124 A.D.3d 1136, 1137 [explanation that wearing hair in long braids signifies rebelliousness was not pretextual].)

7

Blacksher argues further that the prosecutor's reliance on Juror No. 1588's experience with racial profiling was not race neutral because racial profiling predominantly affects racial and ethnic minorities.  This argument, too, is unsupported by evidence or authority, and the consensus appears to be to the contrary.  (See *People v. Cowan* (2010) 50 Cal.4th 401, 450 ["A prospective juror's negative experience with the criminal justice system, including arrest, is a legitimate, race-neutral reason for excusing the juror"]; *Lenix*, *supra*, 44 Cal.4th at p. 628 ["'We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement'"]; see also *U.S. v. Monell* (1st Cir. 2015) 801 F.3d 34, 44 [disparate impact, such as disproportionately negative interaction with police in a particular group, alone, cannot sustain *Batson* challenge]; *Green v. Travis* (2d Cir. 2005) 414 F.3d 288, 300 ["[A] juror's perceived bias against law enforcement can constitute a race-neutral explanation for a peremptory challenge"].)

Here, Juror No. 1588's comment about racial profiling was volunteered in response to the court's inquiry about his best friend's reason for leaving the Washington D.C. Police Department after "traumatic experiences . . . [with] corruption" there. When asked whether he got "any particular feeling" from his friend "about police officers in general," the juror responded:  "I mean, I've been, like, profiled before.  And so, like, when he would say, like, some of the cops kind of did stuff under the table and sideways stuff, it kind of–kind of, you know, rubbed me the wrong way."

The prosecutor explained that she challenged the juror because of "his sort of negative tenor and tone around police officers and himself being profiled."  The prosecutor's rationale for the challenge was based on the juror's volunteered negative experience with and perceived bias against law enforcement, which, as we have explained, are considered race neutral grounds.

*B. The Prosecutor's Credibility*

At the third stage of the *Batson/Wheeler* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how

reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339 (*Miller-El*).) "'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at pp. 613–614, fn. omitted.) "'While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection.' [Citation.]" (*People v. Ward* (2005) 36 Cal.4th 186, 203.)

As we have discussed, the prosecutor's reference to the jurors' outward appearance is not inherently race based, and Blacksher does not show that it was pretextual in light of the jury selection process as a whole. Blacksher has not shown that the prosecutor accepted any liberal-looking non-African Americans. (Cf. e.g. *Jackson v. Evans* (C.D. Cal., Mar. 19, 2012, No. CV 06-7227 PA JC) 2012 WL 7637663 [finding strike based on African-American juror's bright clothing to be pretextual where prosecutor had not challenged non-African-American jurors wearing bright clothing].) Nor has he shown the total number of African Americans in the jury pool, or the percentage of such jurors struck by the prosecution. According to the trial court's description of its final composition, the jury ultimately included two African Americans. (Cf. *Miller-El*, *supra*, 545 U.S. at pp. 240–241 [describing prosecutor's use of peremptory strikes against 91 percent of prospective black jurors as "remarkable"]; see also *Snyder v. Louisiana* (2008) 552 U.S. 472, 475–476 [prosecutor exercised peremptory challenges against all five African American panelists].) On the record before us, the

9

prosecutor's exercise of peremptory challenges based in part on the jurors' personal appearance was not improper.

Blacksher argues that the prosecutor's additional reasons for challenging these two jurors are not supported by the record. While we need not defer to the trial court if the record does not objectively support the prosecutor's explanations (*People v. Arellano* (2016) 245 Cal.App.4th 1139, 1169), here the prosecutor did not mischaracterize Juror No. 1588's answer regarding police corruption. Blacksher invites us to conclude the juror was not biased against police by focusing on his comments that "there are some good cops. There are some bad cops," and that in assessing police officer testimony, he could lean either way depending on the evidence, credibility, and the "vibe" he would get. Notwithstanding these comments, the prosecutor reasonably could interpret the juror's initial answer that his friend's description of police corruption had "rubbed [him] the wrong way," coupled with the juror's own belief that he had been racially profiled, to suggest some bias against police officers. Because the juror's answers "could be fairly characterized as equivocal, supporting the prosecution's inference[,] . . . . possible contrary inferences do not undermine the genuineness of the prosecutor's explanation." (*Lenix*, *supra*, 44 Cal.4th at p. 628.)

Blacksher contends the prosecutor also misrepresented Juror No. 3243 as "'friendly' with criminal street gangs," even though the juror did not discuss her friendships with gang members. That is not a fair representation of the record. The juror acknowledged that she had friends who were gang members, and her discussion of those friendships can reasonably be viewed as equivocal. The juror said: "In my experience all my friends that are gang members didn't start that way. They started as my friends. So I mean, I condone what they do or be a gang member, but they were still my friends. I could separate myself from what their activity and things like that, but I can't say that all gang members are criminals."

Blacksher argues the juror was not friendly with gang members because they were her friends before they became involved with gangs. But the prosecutor's concern about the juror's response stems precisely from her apparent divided loyalties and willingness

10

to compartmentalize those relationships. Blacksher places great weight on the fact that the juror reported gang activity at her rental property to police. While that fact may reasonably support a different assessment of the juror's attitude toward gang activity, under the substantial evidence standard of review, we do not reweigh the evidence and must view an ambiguous juror response as supporting the prosecutor's explanation. (*Lenix*, *supra*, 44 Cal.4th at p. 628.) The fact that the juror had sat on other criminal cases does not impeach the prosecutor's challenge because, as the prosecutor ascertained, none of those cases had been gang related.

According to Blacksher, the prosecutor's reason for challenging Juror No. 3243 was pretextual because the prosecutor did not strike other jurors who had "experience or exposure to gangs." In responding to the *Batson*/*Wheeler* motion, the prosecutor made a general statement that she did not want "anyone to sit on this jury who was ever friends with gang members." She later added, "if you look at the other individuals who I have exercised challenges against, they are also individuals who have friendships or relationships or know well, other gang members. Family members who were in gangs. People who know gangs. I don't want people who know gangs or have family in gangs to be on this jury." After the jury was approved, Blacksher's trial counsel stated on the record that despite the prosecutor's professed intent to "kick off everyone that had any kind of gang connection," Juror No. 10, who was not African American, had gang connections, but nevertheless remained on the jury.

During voir dire, Juror No. 10 (Prospective Juror No. 3516) stated she had grown up and gone to school in a gang area, but had not been friends with any classmate who belonged to a gang. She had been robbed by gang members on her way back from school. Since then, the area where she grew up and where her parents still lived had been subject to a successful gang injunction that had cleared it of gangs, and it was "pretty calm now."

After trial, the prosecutor explained that this juror was allowed to serve because she "is not friends with any gang members. She lives in an area where gangs exist, but she doesn't have that relationship or connection that the other jurors had expressed. [¶]

11

In addition, . . . . she actually had a much more conservative look to her.  She looked like a woman who lives in an area where, yes, gangs exist, but she doesn't have contact with these people.  And she—you could tell was sort of averse to the whole idea of gangs being in her neighborhood."

Despite the prosecutor's confusion about the timeframe of the juror's experience with gangs, the retention of this juror, who had no gang connections other than growing up in a gang area, was consistent with the prosecutor's professed intent not to accept jurors who had friends or relatives in gangs.  The prosecutor's broader comment that she was unwilling to accept any juror who knew gangs cannot reasonably be understood to mean that she sought exclusion of all prospective jurors who had any experience with or exposure to gangs, regardless of the nature and extent of that experience or exposure.

Blacksher's attempt to compare Prospective Juror No. 3243 to other jurors whose situation was not discussed in the trial court also is unpersuasive.  Following United States Supreme Court precedent, the California Supreme Court has modified its previous opposition to conducting comparative juror analysis for the first time on appeal.  (*Lenix*, *supra*, 44 Cal.4th at p. 628, citing *Miller-El*, *supra*, 545 U.S. 231; *Snyder v. Louisiana*, *supra*, 552 U.S. 472.)  Nevertheless, the court has stressed that "appellate review is necessarily circumscribed.  The reviewing court need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment.  Further, the trial court's finding is reviewed on the record as it stands at the time the *Wheeler*/*Batson* ruling is made."  (*Lenix*, at p. 624.)  Comparative analysis on appeal must be made on an adequate record, tempered by deference to the trial court, and cannot generally be the sole basis for finding intentional discrimination, due to its inherent limitations.  (*Id.* at pp. 622, 626.)

In his opening brief, Blacksher identifies Prospective Jurors Nos. 1637, 5220, 4165, 8690, 2467, 8619, 3516, and 3562 as comparable to Prospective Juror No. 3243.  Blacksher's choice of jurors and facts for comparison is facially indiscriminate because it includes jurors with no personal experience with gangs, such as Prospective Juror No. 1637, whose roommate had killed a Blood gang member in self-defense, and Prospective

12

Juror No. 8619, who lived in a gang area but denied having any personal experience with gangs. In addition, Prospective Juror No. 4165, much like Prospective Juror No. 3516 (Juror No. 10), had grown up in a gang area and gone to school with gang members, but denied having "any direct connection to them."

More fundamentally, Blacksher's assumption that by not immediately striking a juror the prosecutor must have wanted that person on the jury ignores the realities of jury selection in this case. The selection process here was different from that in the recent United States Supreme Court case, *Foster v. Chatman* (2016) ___U.S.___ [136 S.Ct. 1737, 1749], where the prosecution exercised all its strikes first, after which "the defense could accept any prospective juror not struck by the State without any further opportunity for the State to use a strike against that prospective juror." Here, in contrast, the prosecution and defense alternated in exercising peremptory challenges against prospective jurors seated in the jury box.

The record indicates that the prosecutor consistently challenged jurors with gang connections. Her first challenge was to Prospective Juror No. 3585, whose brother and nephew were active gang members.[7] Prospective Juror No. 3243, whose dismissal is at

---

[7] Blacksher misidentifies this juror as Juror No. 8690 and claims that the juror was struck by the defense. The error is due to the continuous misidentification of several prospective jurors in the reporter's transcript. Prospective Juror No. 8690, a city planner with no gang experience, occupied seat 11. Prospective Juror No. 4360, a student who occupied seat 12, was questioned by the court and immediately allowed to reschedule so as not to miss school. The court reporter initially correctly identified this juror, but then, inexplicably, misidentified him as "Juror No. 8690" on several pages of the voir dire transcript. After Juror No. 4360 was excused, Prospective Juror No. 3585 was seated in seat 12. Once again, the court reporter correctly identified the switch, but then, again inexplicably, misidentified Juror No. 3585 as "Juror No. 8690" on several pages.

The misidentification of jurors in the record highlights one of the problems with performing comparative juror analysis on appeal. The record in this case presents additional problems, which Blacksher's incomplete citations fail to alleviate. During voir dire, jurors often were identified inconsistently by either their four-digit prospective juror number or their seat number, which makes tracing a juror throughout the record unduly burdensome. The difficulty is compounded by the fact that prospective jurors were excused by the court for various reasons during the proceedings, and their seats were

issue in this case, was the subject of her second challenge. Striking the juror who had gang member friends was consistent with striking the juror who had relatives involved in gangs. The defense then struck Prospective Juror No. 1637, whose roommate had killed a Blood gang member. Even assuming that this juror fit the prosecutor's profile of an objectionable juror, the prosecutor can hardly be faulted for not striking the juror sooner if she consistently used her strikes to excuse similarly situated jurors.

Next, the prosecutor challenged Prospective Juror No. 5306, whose brother was a convicted gang member. The defense then challenged Prospective Juror No. 5220 in seat 6, whose cousin was an imprisoned gang member. The last juror the prosecutor was allowed to challenge during this first round of strikes was Prospective Juror No. 8720 in seat 8. The record as to this juror is somewhat unclear. In the initial voir dire, the juror, who was pursuing an advanced degree in mathematical logic, stated he had no experience with gangs but volunteered his belief that the question was irrelevant and made other unsolicited comments. Later on, the same juror is recorded as claiming to have been the victim of three drive-by shootings by gang members, a discrepancy that cannot be resolved on appeal.

Our review of the first round of peremptory challenges finds no support for Blacksher's claim that the prosecutor's gang-related reasons for challenging Juror No. 3243 were pretextual. Two additional jurors Blacksher identifies as comparable to Juror No. 3243 were excused by the court. The first, Prospective Juror No. 4165, grew up in a gang neighborhood but had no gang connections. The juror was excused before the prosecutor had an opportunity to exercise a peremptory challenge. The second, Prospective Juror No. 2467, had relatives, and growing up had friends, who were gang members. The juror was excused between the first and second round of peremptory challenges. Nothing in the record suggests whether the prosecutor ultimately would have accepted either of these jurors, and we decline to speculate. The fact that she did not

---

filled either by moving prospective jurors already seated in the jury box from one seat to another, or by filling empty seats from the jury pool.

14

strike Juror No. 2467 during the first round of challenges is not dispositive because, in the second round, the prosecutor challenged Prospective Juror No. 5599, who like Juror No. 2467 had been in the first group of prospective jurors seated in the jury box.

We need not consider Prospective Juror No. 3562 in seat 1, whose friends in high school had been gang members, because that juror was not seated in the jury box until after the court ruled on the *Batson*/*Wheeler* motion during the second round of challenges. (See *People v. O'Malley* (2016) 62 Cal.4th 944, 977, fn. 10 [prosecutor does not have opportunity to compare jurors not yet seated in box]; *Lenix*, *supra*, 44 Cal.4th at p. 624 ["the trial court's finding is reviewed on the record as it stands at the time of the *Wheeler*/*Batson* ruling"].) Regardless, the juror was immediately challenged by the defense in the third round of challenges, before the prosecutor indicated her first provisional acceptance of a jury panel. Under the circumstances, it would be speculative to assume that the prosecutor would have accepted this juror.

As in *Lenix*, *supra*, 44 Cal.4th 602, 631, here "[t]here is no indication that the prosecutor or [her] office relied on racial factors. There is no evidence of procedural manipulation, deceptive questioning, or any of the other signs of constitutional violation like those present in *Miller–El*[, *supra*, 537 U.S. 322]." Blacksher has not shown that the prosecutor's reasons for striking the two African American jurors were not genuine and race neutral.

II

Two evidentiary issues relate to Blacksher's defense that he was not present in room 8 at the time of the shooting. He argues the court violated his federal constitutional rights by excluding the testimony of his expert on eyewitness identification and by limiting cross-examination of a Metro PCS custodian of records about the unreliability of cell phone tracking based on cell tower connectivity.

A. *Exclusion of Expert Testimony on Eyewitness Identification*

In a leading case on expert testimony regarding eyewitness identification, the California Supreme Court held that "the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter

15

within the trial court's discretion," and is subject to deference. (*People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) "Yet deference is not abdication. When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability . . . , it will ordinarily be error to exclude that testimony." (*Ibid.*) In other words, "[e]xclusion of the expert testimony is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it independent reliability." (*People v. Jones* (2003) 30 Cal.4th 1084, 1112.)

We do not find an abuse of discretion in the trial court's exclusion of testimony by Blacksher's eyewitness identification expert. Before trial, only Shanice had placed Blacksher in room 8, but during trial, Melchor corroborated Shanice's testimony. Their eyewitness testimony was substantially corroborated by circumstantial evidence. Blacksher's cell phone records placed him in the general area of the Palms Motel at about the time of the shooting, and DNA evidence placed him next door, in room 7. A text message he sent after the shooting included an admission that he had "sinned." There also was evidence that Blacksher was away from the transitional center where he was living at the time, and his attempts to create an alibi, deactivate his cell phone, avoid providing a DNA sample, and dissuade Melchor from testifying are strong circumstantial evidence of guilt. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1029 ["Evidence the defendant used a false alibi is relevant to prove consciousness of guilt"]; *People v. Vines* (2011) 51 Cal.4th 830, 867 [an "accused's efforts to suppress evidence against himself indicate a consciousness of guilt"].) That Shanice and Melchor "could be impeached by proof of bias or prior inconsistent statements" is not dispositive because the "cumulative corroborative effect" of the additional evidence "is sufficient to give independent reliability to the eyewitness identification." (*People v. Jones*, *supra*, 30 Cal.4th at p. 1112.)

A state court's application of the ordinary rules of evidence generally does not violate the federal constitutional right to present a complete defense. (*People v. Lawley*

16

(2002) 27 Cal.4th 102, 155.) Blacksher relies on *Holmes v. South Carolina* (2006) 547 U.S. 319, but that case is distinguishable. In *Holmes*, the United States Supreme Court concluded that South Carolina's categorical exclusion of third-party-guilt evidence in cases where there was strong forensic proof of the defendant's guilt violated the defendant's right to present a complete defense. (*Id.* at pp. 330–331.) In *People v. Goodwillie* (2007) 147 Cal.App.4th 695, the court distinguished *Holmes* because the defense at issue in *Goodwillie* was mistaken identity rather than a particular third party's guilt as in *Holmes*. The court reasoned: "By not allowing the defendant to call his witnesses, the South Carolina trial court entirely prevented the defendant from presenting his defense. In contrast, while Goodwillie was not allowed to present expert testimony regarding the unreliability of eyewitness testimony, he was permitted to cross-examine the eyewitnesses to raise possible problems with their identifications of him. The court's decision to exclude the expert testimony did not prevent Goodwillie from offering evidence, if such evidence existed, showing that some eyewitnesses failed to identify him as the perpetrator. Thus, the California evidentiary rule regarding expert eyewitness identification testimony did not entirely prevent Goodwillie from presenting a defense of mistaken identification." (*Goodwillie*, at pp. 728–729.)

Similarly, here, the defense was allowed to cross-examine Shanice and to argue to the jury that her identification of Blacksher was not trustworthy. In addition, Blacksher's counsel argued that Shanice, Melchor and Davis had reasons to shift the blame to Blacksher. After the jury requested additional argument about the evidence (besides the eyewitness testimony) that placed Blacksher in room 8, his attorney was given an opportunity to reargue the evidence. Blacksher's defense theory was not so much that eyewitness testimony was unreliable because of the peculiarities of observation and recollection, which was the subject of the expert's proposed testimony, but that the eyewitnesses intentionally lied in order to shift the blame from Davis. The court did not prevent Blacksher from presenting that defense.

### B. Cross-examination of Custodian of Records

Blacksher argues that the court improperly limited his cross-examination of the

Metro PCS custodian of records, violating his federal constitutional right to confrontation.

"'"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" [Citations.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 494.)

Blacksher sought to cross-examine the Metro PCS custodian of records about articles challenging the scientific reliability of tracking the location of a cell phone based on the cell tower to which it connected during a particular call. The court sustained the prosecutor's objections that this line of questioning was irrelevant and argumentative, finding the custodian of records was not an expert witness. Blacksher's counsel responded that the witness had testified "as an expert" but did not move to strike his testimony as improper lay opinion. Respondent concedes the custodian of records was not qualified to offer expert witness testimony because he admittedly had only "rudimentary knowledge of how the phone system works between the phone, the tower, and the switches." Since the custodian was not qualified as an expert witness, the court

18

did not abuse its discretion in limiting the defense's cross-examination of him about the content of published materials.[8]

Blacksher does not raise the more fundamental question whether the custodian of records' testimony itself was improper because cell tower tracking testimony must come through an expert witness. Nationally, there is a split of authority on this issue. (See e.g. *United States v. Ransfer* (11th Cir. 2014) 749 F.3d 914, 937 [lay testimony acceptable regarding connectivity to closest tower]; but see *U.S. v. Banks* (D. Kan. 2015) 93 F.Supp.3d 1237 [expert testimony necessary on most aspects of cell phone operation]; see also e.g. Wells, *Ping! The Admissibility of Cellular Records to Track Criminal Defendants* (2014) 33 St. Louis U. Pub. L. Rev. 487, 506–518 [describing split of authority among jurisdictions]; Dumm, *The Admissibility of Cell Site Location Information in Washington Courts* (2013) 36 Seattle U. L. Rev. 1473, 1485–1490 [same].) Since Blacksher's trial counsel did not object to the admissibility of the custodian of record's testimony as improper lay opinion, and his appellate counsel does not argue that the testimony was inadmissible, we do not decide whether the witness should have been allowed to testify as he did. (See *People v. Dowl* (2013) 57 Cal.4th 1079, 1087 [failure to object to witness's qualification to render expert opinion forfeits challenge to opinion].)

## III

Appellants challenge the jury instructions on first-degree murder and felony murder.

### A. *Natural and Probable Consequences Doctrine*

Blacksher contends the jury was erroneously instructed on the natural and probable consequences doctrine of aiding and abetting. Under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), the instruction cannot support a conviction of first-degree murder.

---

[8] It also is questionable whether the proposed cross-examination complied with Evidence Code section 721, subdivision (b), which precludes cross-examination of an expert witness with a publication unless it has been considered by the witness in forming an opinion, has been admitted in evidence, or has been established as a reliable authority.

19

We independently review whether a challenged instruction accurately states the law. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) When an instruction is challenged as subject to an erroneous interpretation by the jury, we review the instructions as a whole to determine whether there is a reasonable likelihood the jury understood the challenged instruction in the manner asserted by the defendant. (*People v. Cross* (2008) 45 Cal.4th 58, 67–68.)

Blacksher acknowledges that the murder instructions in this case did not include CALCRIM No. 403, the instruction found objectionable in *Chiu*, *supra*, 59 Cal.4th 155. Nevertheless, he argues that the jury was instructed on the natural and probable consequences doctrine through CALCRIM No. 520. That instruction provides the basic elements of murder: commission of an act that caused the death of another person with express or implied malice. For the latter type of malice, the instruction, as modified, informed the jury: "A defendant acted with implied malice if: [¶] 1. (He) intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶ ] 3. At the time (he) acted, (he) knew (his) act was dangerous to human life; [¶] AND [¶] 4. (He) deliberately acted with conscious disregard for (human) life. . . . [¶] [An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.]"

CALCRIM No. 520 could not have instructed the jury on the natural and probable consequences doctrine of aiding and abetting because it says nothing about aider and abettor liability. Instead, it instructs that first-degree murder may be established on proof of premeditation and deliberation (CALCRIM No. 521) or on a felony-murder theory (CALCRIM Nos. 540A and 540B), and the jury was separately instructed on those theories.

CALCRIM No. 540B addresses aider and abettor liability in the context of felony murder. As modified, it directed the jury to find the following: "1. A defendant

20

(committed [or attempted to commit][,]/ [or] aided and abetted . . . burglary and/or kidnapping; [¶ ] 2. A defendant (intended to commit[,]/ [or] intended to aid and abet the perpetrator in committing . . . burglary and/or kidnapping; [¶ ] 3. If the defendant did not personally commit [or attempt to commit] burglary and/or kidnapping, then a perpetrator, (whom the defendant was aiding and abetting . . . , personally committed [or attempted to commit] burglary and/or kidnapping; [¶] AND [¶ ] 4. While committing [or attempting to commit] burglary and kidnapping, the perpetrator caused the death of another person." The jury also was instructed on general aider and abettor liability with CALCRIM No. 401, which does not mention the natural and probable consequences doctrine.

Blacksher asserts that the combination of these instructions likely misled the jury to conclude he was guilty of murder because he aided and abetted burglary or kidnapping, of which murder was a natural and probable consequence, without finding that he aided and abetted murder with the requisite mental state. He argues that is prohibited by the decision in *Chiu*, *supra*, 59 Cal.4th 155.

The holding in *Chiu* expressly "does not affect or limit an aider and abettor's liability for first degree felony murder under section 189," which operates independently of the natural and probable consequences doctrine. (*Chiu*, *supra*, 59 Cal.4th at p. 166.) "The natural and probable consequences doctrine 'allows an aider and abettor to be convicted of murder, without malice, even where the target offense is not an inherently dangerous felony.'" (*People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1026, quoting *People v. Culuko* (2000) 78 Cal.App.4th 307, 322.) In contrast, the felony-murder rule applies only to enumerated felonies "'that are inherently dangerous to life or pose a significant prospect of violence. . . .' [Citations.] 'Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning—if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances.'" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1158–1159.) The deterrent purpose of the rule "'"outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate

21

or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof.'" [Citation.]" (*Id*. at p. 1159.)

The target felonies of burglary and kidnapping, on which aider and abettor liability was premised for purposes of felony murder, are among the inherently dangerous felonies enumerated in section 189. There is no basis to conclude that the jury could have been misled into finding Blacksher guilty of first-degree murder based on aiding and abetting a felony that was not inherently dangerous.

*B. Felony Murder Based on Kidnapping*

Davis contends the evidence is insufficient to support instructing the jury on felony murder based on kidnapping or attempted kidnapping. "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) However, such error generally is technical and does not require reversal, "absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Ibid*.; *People v. Cross*, *supra*, 45 Cal.4th at p. 67.) Prejudice may be "affirmatively demonstrated" if the prosecutor stressed "only the invalid ground in the jury argument, and the jury asked the court questions during deliberations directed solely to the invalid ground." (*Guiton*, at p. 1129.)

Although the jury was instructed on burglary and kidnapping as separate bases for felony murder, in closing argument, the prosecutor made clear that the felony-murder theory was based on appellants' commission of burglary with the intent to feloniously assault the victim and kidnap Shanice. The intent to kidnap was supported by Davis's recorded statement to the confidential informant that the plan was to get in the room and "kidnap the bitch." In closing, the prosecutor acknowledged: "No one in this case was kidnapped. And I'm not proving that they were." The prosecutor went on to explain that burglary does not require that the intended crimes be committed: "I don't have to show

22

they actually did a kidnapping or attempted to, and I don't have to show that they actually assaulted [the victim], although here the evidence is overwhelming that they did."  The closing argument does not show that the prosecutor in any way stressed kidnapping as a direct predicate crime of felony murder.

Nor is there any indication that the jury convicted Davis of felony murder by reason of a homicide committed during a kidnapping.  Davis relies on the jury's request for a readback of the testimony of Shanice and Kayonna about the period between the time when the door was kicked in and the time when the girls reached the bottom of the stairs.  Nothing in that request suggests that it was "directed solely" at whether a kidnapping was attempted or occurred.  (See *People v. Guiton*, *supra*, 4 Cal.4th at p. 1129.)  Even assuming there was insufficient evidence to support the kidnapping instruction, no prejudicial error occurred.

IV

The jury found true the allegations that a principal personally used and intentionally discharged a firearm causing death, but not true the allegations that either appellant personally and intentionally did so.  (§ 12022.53, subds. (b)-(d) & (e)(1).)  Appellants argue that the jury's inconsistent findings on the firearm allegations require reversal of the firearm enhancement.

"It is well established that, under section 954, inconsistent verdicts are allowed to stand if the verdicts are otherwise supported by substantial evidence.  [Citation.] . . . The rule applies equally to inconsistent enhancement findings [citation], and to an enhancement finding that is inconsistent with the verdict on a substantive offense.  [Citation.]"  (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405.)  Appellants' arguments to the contrary are not persuasive.

*In re Johnston* (1935) 3 Cal.2d 32, on which Davis relies, is inapposite.  In that case, the defendants were convicted of conspiracy even though they were acquitted of all crimes that served as the overt acts for the conspiracy charge.  The court held that because the defendants were acquitted of the predicate crimes, they necessarily were acquitted of conspiracy.  (*Id*. at pp. 34–36.)  As recognized in *People v. Pahl* (1991) 226

23

Cal.App.3d 1651, 1658, "[t]he conspiracy exception is limited, applying only where, as in *Johnston*, an overt act alleged in a conspiracy charge is identical to another charged offense of which [the] defendant is acquitted." The court warned that broad restatements of the conspiracy exception are inaccurate and misleading since they generalize it beyond the particular context in which it applies. (*Pahl*, at p. 1659–1660.)

Blacksher relies on one such misleading generalization, which was criticized in *People v. Pahl*, *supra*, 226 Cal.App.3d 1651, 1659. In *People v. Hamilton* (1978) 80 Cal.App.3d 124, overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 481, the court described the "limited judicial exception" to the inconsistent verdict rule as applicable "where all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty." (*Hamilton, supra,* at p. 130.) Despite its broad statement of the exception, the only example the *Hamilton* court cited had to do with its application in conspiracy cases. (*Ibid*.)

Apart from the lack of authority for its broad application, the limited exception to the inconsistent verdict rule does not aid appellants because personal use of a firearm is not necessary to sustain a conviction of murder or a firearm enhancement. "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. [Citations.] . . . [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and

24

abettor, but no such doubt that he was one or the other." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918–919.)

On the facts of this case, the jury's not true findings on the personal firearm use allegations suggest the jurors had a reasonable doubt as to which of the two appellants shot the victim.  The evidence shows one of them did.  The verdict indicates that, not being convinced beyond a reasonable doubt as to which one did the shooting, the jury gave each appellant the benefit of the doubt.  This was entirely proper and consistent with the reasonable doubt instruction.

V

Blacksher contends the cumulative effect of the claimed trial errors mandates reversal of his conviction.  Because we have rejected his other claims, the claim of cumulative error also fails.   (See *People v. Sapp* (2003) 31 Cal.4th 240, 316.)

**DISPOSITION**

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

25